THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* ALFONSE BRENGARD, Appellant.

(Argued May 28, 1934; decided July 3, 1934.)

*S. Frederick Placer* and *Charles N. Wysong* for appellant.

*Elvin N. Edwards,* District Attorney (*Philip Huntington* and *Albert M. De Meo* of counsel), for respondent.

O'BRIEN, J.   On July 22, 1928, John Kennedy was shot and on July 13, 1932, he died.   He was a uniformed officer attached to the police force of Nassau county and, while patrolling alone in a police car at midnight, he discovered an unoccupied automobile parked in a secluded rural lane.   In the course of his investigation concerning this car he was shot by some person whom he never identified.   On October 2, 1933, the defendant Brengard was jointly indicted with William French, " each aiding and abetting the other," for murder in the first degree. On a joint trial, French was convicted of murder in the second degree and Brengard in the first degree.   Only Brengard's appeal is before us.   Many points for reversal are urged and we have carefully considered all of them. Three merit discussion.

Is the evidence sufficient to prove beyond a reasonable doubt that Brengard is the person who shot or aided and abetted in shooting Kennedy and, if his identity be

established, is the proof sufficiently strong to show deliberation and premeditation? The parked car which the policeman found in the woods was the property of Brengard. His hat lay a few feet from the car. The bullet which entered Kennedy's body was shot from a revolver owned by Brengard. A day or two after the shooting, as he admitted, he filed certain identifying numbers from this weapon and hid it in a chicken coop at his home. He did not take the stand as a witness, but in statements made to the authorities he denied that he was present at the scene of the assault and at first denied that French had ever been out in his car but later asserted as an explanation for the presence of his car and his hat in the woods where Kennedy had been shot and the fact that it was his revolver with which the assault had been committed, that he had loaned his car to French for the purpose of visiting friends and that his hat and revolver were in it at the time. He stated that on the night of the assault he had been training for a prize fight at a gymnasium but no witness came forward at the trial to testify to such a fact. His parents and a friendly neighbor, however, did swear that he was at home when the shooting occurred but their credibility was for the jury. In reply to the question, asked by a police officer, why French should accuse him of the shooting, as French had done in his presence, he answered that French associated with some people who might want to get even with him. From this evidence the jury was justified in drawing inferences beyond a reasonable doubt that Brengard was present at the time of the attack and that the hand which discharged the weapon was the hand of the owner. That he shot with intent to kill is supported by requisite evidence. He had formerly been a member of the State police and, as such, he was accustomed to the use of firearms. The bullet which hit Kennedy penetrated the abdomen and liver and lodged in the spinal column. In the selection of this part of the anatomy as a target,

a skilled pistol shot may be concluded to have intended to inflict a fatal wound. Considering the elements of deliberation and premeditation, the fact that Kennedy and his police car were so located as to impede or prevent the departure of defendant's car is of great significance, presents a question for the jury and constitutes a foundation for the conclusion that the owner of this car, parked at dead of night in a densely wooded locality, deliberately shot an officer of the law as part of a plan to escape. (*People* v. *Morse*, 196 N. Y. 306.) The weapon which was used and the character of the wound which was inflicted considered with the later conduct of defendant, which the jury might view as inconsistent with innocence, forms a basis for the inference of premeditation and deliberation. (*People* v. *Schmidt*, 168 N. Y. 568.)

Was Kennedy's death the result of the bullet wound as the producing cause? The death certificate states the cause of death as cardiac failure due to embolism, and the contributing cause, among others, as " bullet wound." One of the physicians who attended Kennedy testified: " The producing cause of death was the gunshot wound in the spinal column. The contributing causes were chronic pyonephritis, or pus in the kidneys, accompanied by osteomyelitis of the bone matter, with terminal embolism. * * * The primary cause is your bullet wound of the back. The minute that bullet struck his back he started to die then and that is just the last thing that happened." This physician's allusion to the last thing that happened has reference to embolism as the terminal cause of death. At the time of his injury, Kennedy was twenty-three years of age, six feet four inches in height and weighed two hundred and ten or two hundred and twenty pounds. Subsequent to the infliction of his gunshot wound he lost more than one hundred pounds in weight. His right leg was completely paralyzed by the shot in his spinal column and the left leg ninety-five per cent paralyzed; he totally lost control

of the bladder and the rectum. In June, 1929, the bullet was removed from his spine and in April, 1932, his right leg was amputated. In July, 1932, he died. Even without expert opinion evidence, the jury could decline to entertain any reasonable doubt that it was the bullet wound which caused his death.

The most important issue of law, one which has never been decided by this court, relates to the question whether an indictment for murder will lie when death occurs, as it did in this case, more than a year and a day after the assault. At common law it would not lie (Holdsworth's History of English Law, vol. 3, p. 315; Stephen's History of the Criminal Law, vol. 1, p. 247; vol. 3, p. 8), but the Appellate Division in the Second Department has recently decided that the ancient rule has been abrogated by statute. (*People* v. *Legeri*, 239 App. Div. 47.) Decisions in other States hold differently. (*Hardin* v. *State*, 4 Tex. Cr. App. 355; *State* v. *Dailey*, 191 Ind. 678; *State* v. *Orrell*, 12 N. C. 139; *State* v. *Anderson*, 4 Nev. 265; *People* v. *Murphy*, 39 Cal. 52.) Some of the early statutes of this State bestowed partial recognition upon the common-law rule and at the same time departed in some respects from it. By chapter 22 of the Laws of 1787 willful killing by poison was deemed premeditated murder. No reference occurs in that statute to the time elapsing between the administration of poison and the death of the victim. By the same statute the infliction of death by stabbing, under certain circumstances, constituted willful murder, if the victim died within six months. By chapter 29 of the Laws of 1813 the penalty for the crime of killing by poison was modified so that it was punishable by imprisonment for a term not exceeding fourteen years if death did not ensue within a year and a day. These statutes were repealed in 1828. By article I, section 16, of the Constitution of this State the common law continues in force subject to such alteration as the Legislature shall make. Tendering full acknowl-

edgment to the general doctrine that statutes enacted in derogation of the common law must be strictly construed, we think that the Legislature has most substantially and essentially altered the former law relating to murder when death ensues after the lapse of a year and a day. Chapter 266 of the Laws of 1857 directed a Commission to prepare a Penal Code for submission to the Legislature and provided that such Code must *define* all crimes for which persons can be punished. Section 2, as submitted by the Field Commission and adopted by the Legislature, enacted that no act shall be deemed criminal except as prescribed by the Code. This mandate is repeated in section 22 of the Penal Law. In its Preliminary Note, dated December, 1864, to the proposed Code, the Commission expressed " the desire to render *each definition*, as far as possible, *complete in itself* and independent," and observed that the Code " relates chiefly to the enumeration and *definition* of crimes, and the designation of the kind and measure of punishment to be inflicted for each." Among the leading objects of the Commissioners, so they stated, was " to bring within the compass of a single volume *the whole body of the law of crimes* and punishments in force within this State. The existing statute law of crimes, though comprehensive, does not abrogate rules of the common law making criminal many acts which are untouched by statute. * * * As long as the criminality of acts is left to depend upon the uncertain definitions or conflicting authorities of the common law, uncertainty must pervade our criminal jurisprudence." Most particularly and emphatically, the Commission subjoined the following note to the proposed section 241 which defined the crime of murder: " This section is founded on 2 Rev. Stat., 657, § 5. The definitions of the four grades of homicide given in the Revised Statutes, though drawn with care, and resulting, when attentively considered, in an accurate demarcation, are yet obscured and embarrassed with references to each

other, and to *the rules of the common law*. The Commissioners have, in subsequent sections, recommended a modification of the law of manslaughter, distinguishing it into two degrees only, instead of four. In other respects, whenever they have departed, in these definitions of homicide, from the phraseology of the Revised Statutes, it has chiefly been in order *to render each definition independent and sufficient in itself.*" When the object of the Commission was so clearly expressed as to demonstrate a fixed intent to construct in detail a complete definition of each crime so that no part of the entire fabric of the law of crimes could be left to judicial reconstruction, the omission by the Legislature of any reference to a year and a day from the definition of murder (Penal Code, § 241; Penal Law, § 1044 *et seq.*) must be deemed to have resulted from a set purpose. The design of the Penal Code and the Penal Law was to make definitions of crime as nearly certain as possible and, in the execution of this plan for clarity, the abolition of all common-law crimes was accomplished not alone for the advantage of those individuals who might be charged with offenses but also for the benefit of the people of the State. The bar, the courts, society in general, as well as each private person, were to be specifically informed concerning acts which are criminal and the nature and degrees of particular crimes as defined. (*People* v. *Knapp*, 206 N. Y. 373, 380; *People* v. *Ingber*, 248 N. Y. 302, 307.) Killing is not common-law murder unless the victim dies within a year and a day. According to common-law definition, time is one of the elements. Since the crime of murder as defined with exactitude in the Penal Law does not include any limitation as to time, for a court to introduce a limitation would result in a plain defiance of section 21 of this act which directs that it be construed "according to the fair import of [its] terms." An indictment will, therefore, lie against one who commits murder, even though death does not result within the arbitrary span

of time which was fixed by the common law. The question whether the act constitutes murder is necessarily one of fact. An obscure or a merely probable connection between an assault and death will, as in every case of alleged crime, require acquittal of the charge of any degree of homicide. The proximate relationship must, of course, be clearly proved beyond a reasonable doubt. A duty rests upon the trial judge so to instruct the jury and, in the absence of such instruction or in the event of failure of the necessary proof, a similar duty would rest upon a court of review to reverse a judgment of conviction.

The judgment of conviction should be affirmed.

POUND, Ch. J., CRANE, LEHMAN, HUBBS, CROUCH and LOUGHRAN, JJ., concur.

Judgment affirmed.