Eugene R. Canudo, J.
Tired, harassed motorists, struggling against frustrations of present-day driving, often give vent to their emotions by raising voices and hurling challenges against fellow drivers. Occasionally, blows are landed. Usually the moment of anger passes without great harm to anyone. Sometimes, however, as in the case at issue, the result is tragic and irreparable. The absence of criminal law decisions on such cases encourages us to hope that this does not occur very often.
Felix Aponte, a man in his early twenties, has been tried before me, without a jury, for manslaughter in the first degree and manslaughter in the second degree. He is charged with the death of 49-year-old Irving Adelman who, immediately *284 after an encounter on the Belt Parkway in Brooklyn at about 11:30 on a Sunday evening in July, 1973 after a lane-switching dispute, suffered a heart attack from which he never recovered. Both men, with their wives, were homeward bound at the time.
Mrs. Adelman, the widow, testified that the defendant drove in an unsafe manner, passed the Adelman car, then stopped and backed up, forcing her husband’s car to stop. Adelman rolled down his window, she said, while Aponte — out of his car —walked back toward him. He challenged Adelman to get out and fight, and was informed by husband and wife that Adelman was a sick man, suffering from a bad heart, and could not accept the challenge. Then, she said, the defendant opened the car door and punched the older man, three, four or five times in the chest and in the face, knocking his glasses off his face, notwithstanding her repeated entreaty that he leave her husband alone because of his poor physical condition. According to Mrs. Adelman, the defendant was finally pulled away by a stranger to whom Aponte is alleged to have said: "If he is a sick man he shouldn’t drive a car.” At this point, she said, Adelman complained that he did not feel well and was placed in the back seat of the car. The stranger, a man named Walter Hairy, volunteered to drive the Adelman car to Coney Island Hospital. Soon after they started, Adelman tried to open a container of nitro-glycerine pills, but could not manage it. While trying to hand the container to his wife, he had a tremor, she said, and slumped down, unconscious.
Aponte’s version differed considerably from that of Mrs. Adelman. He testified that because Adelman had been switching lanes, he found it advisable to pass him; that this resulted in the rear bumper and tail light of his car being hit by Adelman’s car; that he stopped, got out and walked back to the Adelman car, as did Mrs. Aponte; that he requested the other man to produce his license and registration but was rudely rebuked by husband and wife; that finally, upset, he reached through the open window and slapped Adelman once in the cheek. He denied having heard anything at all about a bad heart and stated that he would not have struck Adelman or even yelled at him if he had known he was a sick man. Mrs. Aponte testified that she did hear something about a heart condition, but that this was only after her husband had slapped Mr. Adelman.
Aponte unquestionably understated the extent of his physi *285 cal assault upon Adelman. The police officer who arrested him a few hours after the incident, and an Assistant District Attorney who questioned him later that day, both testified that the defendant stated that he had angrily punched Adelman in the chest, adding that he had landed only one blow.
Walter Kairy, on the witness stand, said that he was passing by in his own car with his wife and some guests, when he observed the disturbance with traffic backed up, and decided to investigate. He saw Aponte punching Adelman in the chest and face, while Mrs. Adelman was calling out to leave her husband alone because he was a sick man with a heart condition. Kairy said he pulled Aponte away, not without some difficulty, and when Aponte wanted to go back to the encounter, said to him: "If you want to fight, fight with someone who is younger.” Observing, then, that the older man seemed to be quite shaken and complained of not feeling well, Kairy helped put him into the back seat and volunteered to leave his own car and drive the Adelman car to the hospital. They had gone some 20 or 25 feet, he said, when Adelman, trying to open a container of pills, collapsed.
The entry on the medical chart at Coney Island Hospital, upon admission, showed cardiac arrest, ventricular fibrillation, patient comatose. Although he was defibrillated three times through shock treatment while in the hospital, Adelman never fully recovered consciousness. He died 14 days after his admission. The cause of death was listed in the autopsy report as homicidal assault resulting from a slap in the face. However, Dr. Dominick J. DiMaio, the city’s acting chief medical examiner, who as borough superintendent had participated with two other physicians in the autopsy, testified that police information outside of the report indicated that there had been blows to the body. No external bruises or other marks were observed in the tissue around the area of the chest, either upon admission or in the postmortem examination. However, Dr. DiMaio, who testified that he had performed some 19,000 autopsies during his long career as a pathologist, testified that severe internal injuries are often found even where there are no external marks of violence. The collapse in the car and Adelman’s death, he said, were directly related to the blows on the chest. He added that any injury could have caused ventricular fibrillation, and admitted that to a person in Adelman’s delicate condition any stress or strain could have brought about the same result.
*286 Although the physicians who participated in the autopsy did not have the previous medical history before them at the time, the fact is that Adelman was a very sick man. He was suffering from atherosclerosis with 95% blockage of the right coronary artery and 60% blockage of the left coronary artery. Other conditions described in his chart included arteriosclerosis, diabetes mellitus, hypertension, duodenal ulcer and chronic bronchitis. He had had a kidney removed some six years before, and had an aortic bypass. Just a year before the incident he had suffered a myocardial infarction requiring treatment in Coney Island Hospital for some three weeks, followed by resumption of employment and out-patient treatment since that time. Three brothers had died of heart conditions and, at the time of the incident, Adelman was a pack- and-a-half-a-day cigarette smoker.
The fact that death did not follow immediately upon the attack is of no significance. In People v Brengard (265 NY 100), a murder conviction was affirmed even though death came four years after the inflicting of a bullet wound. It is the causal connection that controls, said the court. "The proximate relationship” they said, "must, of course, be clearly proved beyond a reasonable doubt” (p 108).
The defense argues that the People have failed to prove causation beyond a reasonable doubt and that it was pure speculation to assign the assault as the cause of the ventricular fibrillation. They quote Dr. Peter Wedeen, a physician of broad and long experience who testified for the defense, in contending that any stress or excitement might have caused the collapse, as, for example, the heat of the summer night, the difficult driving conditions of the moment, the alleged bumper impact, the fact that the defendant got out of his car and approached the Adelman car in a state of apparent anger, or even the argument that ensued. It is quite clear that a person in the precarious state of health of the deceased — who, by getting behind the wheel, was endangering his own life and that of others — could have been so affected by any of these things. But the fact remains that immediately before the attack Adelman was driving, did stop his car, did roll down his window, and did converse with the defendant. The evidence given by the good Samaritan, Hairy, confirms the fact that immediately after the attack Adelman appeared shaken and complained of feeling ill and that very soon thereafter he lost consciousness. A number of other things could have *287 caused the death of this very sick man, but in determining cause and effect this court can reach no other conclusion but that the startling event which actually did cause the collapse was the physical assault upon Adelman by the defendant.
People v Kibbe (35 NY2d 407), decided last year, involved the death of a robbery victim who had contributed to his own tragic fate by voluntary intoxication in a public bar and flashing hundred-dollar bills while in that state. After being robbed by his drinking companions, he was abandoned alongside a dark road in near-zero temperature without shoes, eyeglasses or outer clothing, half a mile from the nearest structure. He sought assistance on the public road. It was held that his death, although resulting directly from the fact that he was hit by a truck when he sought help, was attributable to the actions of those who had placed him in that dangerous situation. The supervening incidents, said the court, did not detract from the directly foreseeable consequences of the defendants’ wrongful acts. Reference was made in Kibbe to the somewhat similar situation in People v Kane (213 NY 260), where the person who inflicted bullet wounds on a pregnant woman was held criminally responsible for her death even though negligent or improper medical treatment may have had some causative influence in that regard.
The relevant language of subdivision 1 of section 125.20 of the Penal Law says that one is guilty of manslaughter first degree when, with intent to cause serious physical injury to another, he causes the death of that person. Serious physical injury is defined in subdivision 10 of section 10.00 of the Penal Law, as "physical injury which creates a substantial risk of death, or which causes death or serious or protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ.” The facts do not bear out the prosecution’s obligation to prove beyond a reasonable doubt that Aponte, with intent to cause physical injury creating a substantial risk of death, contemplated the possibility that his assault would result in Adelman’s death. The defendant’s motion to dismiss Count No. 1 of the indictment is therefore granted.
Manslaughter second degree, under subdivision 1 of section 125.15, is committed by one who recklessly causes the death of another person. "A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense,” says subdivision 3 of section 15.05 of the Penal Law, *288 "when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists.” The statute goes on to say that the risk "must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.” The term "gross deviation” appears to be the key. Our inquiry must be whether Aponte caused the death of Adelman by actions representing a gross deviation from the standard of conduct of a reasonable person.
The medical examiner and the defendant’s medical expert agreed on one point: that the state of Adelman’s health was such that any situation of stress could have triggered a fatal heart attack. However, cause (the assault) and effect (the heart attack) are quite clearly pinpointed. The fact remains that Adelman’s collapse came immediately after the assault upon his person.
Whether he was intent on vengeance for a real or imagined wrong and therefore did not listen, or whether, in his anger and excitement, Aponte chose to ignore what he heard, he was put on notice of Adelman’s poor health and bad heart condition. A reasonable person would not have struck and continued to strike — as Aponte obviously did — after being placed on such notice. His behavior, under the circumstances, must be viewed as a gross deviation from the conduct of a reasonable person. "In order that the actor’s conduct may be reckless,” says People v Mason (198 Misc 2d 452, 456 [quoting from the Restatement of Torts]), "it is not necessary that he himself recognize it as being extremely dangerous. His inability to realize the danger may be due to his own reckless temperament or to the abnormally favorable results of previous conduct of the same sort. It is enough that he knows or has reason to know of circumstances which would bring home to the realization of the ordinary, reasonable man the highly dangerous character of his conduct.”
For the reasons stated above, the motion to dismiss the second count of the indictment is hereby denied, and the defendant is found guilty of the crime of manslaughter second degree.