148

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v JAMES GALLO, Respondent.

First Department, June 12, 1980

### APPEARANCES OF COUNSEL

*David H. Steiner* of counsel *(Brian Rosner* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for appellant.

*Stanley M. Meyer* of counsel *(Meyer, Light & London,* attorneys), for respondent.

### OPINION OF THE COURT

BIRNS, J.

James Gallo was tried under an indictment which charged him with the crime of murder in the second degree. The jury was unable to reach a verdict. A mistrial was declared. Thereafter, responding to defendant's motions made at the close of the People's case and at the end of the trial, the court issued a trial order dismissing the indictment on the ground that the evidence was legally insufficient.

██ ██ We disagree. We would reverse, reinstate the indictment and remand for a new trial.

On this appeal by the People from the order (CPL 450.20), the issue before us is whether the evidence against defendant was sufficient to warrant submission of the case to the jury. Implicit in the appeal is the further question whether retrial would violate defendant's right not to be twice put in jeopardy for the same offense (US Const, 5th and 14th Amdts; NY Const, art I, § 6; CPL 40.20, subd 1).

We hold that the evidence was sufficient to submit to the jury and that retrial will not violate defendant's right against double jeopardy.

The indictment, consisting of only one count, charged that on April 14, 1978, defendant, while acting in concert with another, intentionally caused the death of one Vincent Ensulo by shooting him with a pistol. Although two men were observed fleeing from the murder scene, James Gallo was the sole person charged in the indictment.

Five witnesses heard the shots that killed Vincent Ensulo on 57th Street near 11th Avenue. They observed two men who had been standing near the victim walk and then run away. None of the witnesses was able to identify the two men, either at the lineup in which defendant participated or at the trial. The best information the witnesses offered was that one of the men was Italian or Spanish, stood approximately six feet tall, and was between 30 and 40 years of age.

One of the witnesses observed the two men enter a red, four-door Ford sedan. The red car, after narrowly avoiding a collision, rapidly moved out of sight, but not before the witness was able to record the license plate number. Investigation revealed that the red car had been reported stolen two days earlier.

A sixth witness, James Byrnes, testified that as he stepped off the curb at 58th Street on the west side of 11th Avenue (one block from the shooting), the red car nearly struck him. After this incident the car sped away, through two red traffic signals. At trial, Byrnes indicated that defendant "most resembles" the passenger in the car. Byrnes also testified that when he saw defendant in a lineup, he (Byrnes) only stated that defendant was "the closest resemblance" to the passenger in the car.

Twenty minutes after the shooting, a seventh witness, Vernel Mazyck, observed the red car, its interior on fire, parked on 37th Street just west of 11th Avenue. Parked within two car lengths was a white Monte Carlo automobile (later determined to be registered in the name of defendant's wife). Mazyck also observed two men. One was seated in the white car, while the other, a fairly tall white man, was walking toward it, from the direction of the burning car. When that man entered the white car, it raced off. Mazyck recorded the license number of the white car and gave it to police officers who arrived within moments.

On April 18, 1978, four days after the shooting, defendant was arrested in Brooklyn, in the white car that had been on West 37th Street on the day of the shooting. He admitted to

the police that the white car was his, that only he and his wife had the keys to it, but stated that the car had not been used on April 14. Defendant also said that he had been working in Brooklyn at Muni Marine, Inc., on April 14.

In addition to the medical examiner's testimony as to the cause of death (four bullets), the prosecution also showed that it was possible to drive from the murder scene to defendant's place of employment in 27 minutes, while traveling within the city's speed limit.

The prosecution then established that defendant had a motive to kill Ensulo. The evidence showed that with Ensulo's co-operation, in 1972, the authorities were able to establish that defendant and one Conigliaro were "loan sharks." The People also showed that on November 1, 1973, defendant with Conigliaro's aid had once before tried to kill Ensulo. As a result of that incident, Conigliaro was left paralyzed by shots that Ensulo fired and defendant pleaded guilty to possession of a loaded gun and was sentenced to three years imprisonment.

Called by the defense, several employees including the paymaster of Muni Marine, Inc., testified that defendant worked on April 14, 1978. The owner of the company specifically recalled assigning work to defendant that day. In addition, defendant's brother-in-law recalled driving defendant to work, and the payroll records indicated that defendant had worked and had been paid for April 14.

Other witnesses testified that Ensulo was dishonest. Harold Jenzen said that he "knew" that Ensulo had once tried to sell various articles of personal property that had been stolen from his (Jenzen's) home. Jenzen also alleged that after Ensulo collected money for the Jenzen family following the death of Jenzen's brother, Ensulo pocketed the cash. Vincent Tizio said that Ensulo never paid for work that Tizio performed and that Ensulo fought with him, as well as others in the neighborhood.

In submitting the case to the jury the court included instructions on identification and circumstantial evidence. During its deliberations of one and a half days, the jury on three occasions requested additional instructions on identification testimony. Responding to these requests and applying its remarks to the testimony of Byrnes, the court observed that "a one-witness identification case presents special and unique problems because of the fallibility of human sense perception and memory," that the jury must determine whether the

identification testimony was "equivocal, uncertain, was it less than positive," that "proof that relies wholly on identification made by eyewitnesses is inherently weak" and that in order to convict, the identification of defendant must be established beyond a reasonable doubt.

Urging that these instructions were wrong, the District Attorney impliedly argues that had the court not told the jury to consider this as a one-witness identification case and that in such a case the identification of defendant must be established beyond a reasonable doubt, the jury would have returned a guilty verdict. The District Attorney further contends that the court erred when it dismissed the indictment for legal insufficiency of the evidence.

In its posttrial decision and order dismissing the indictment the trial court concluded that the evidence was "entirely circumstantial." Emphasizing the inadequacy of the eyewitness testimony offered by the People through Byrnes, the court concluded that the hypothesis of guilt did not flow naturally from the facts found and that those facts did not exclude to a moral certainty every reasonable hypothesis of innocence.

■ Having properly concluded that the People's case was circumstantial, the trial court improperly expounded its view of the trial as a one-witness identification case. It was not such a case. There was no witness who identified defendant as decedent's assailant. Nor was defendant identified by Byrnes as the passenger in the red car which nearly struck Byrnes at 58th Street and 11th Avenue. Byrnes only testified that defendant "most resembles" the passenger in the red car and that defendant in the lineup bore the "closest resemblance" to the passenger in the car. Therefore, it was inappropriate to charge as if Byrnes had made a positive identification.[1] The case against defendant was solely circumstantial. The testimony of Byrnes was no more than an additional circumstance to be considered by the jury in determining whether the defendant was present at the scene of the crime and participated in the killing.

■ It is well settled that proof of guilt resting exclusively on circumstantial evidence is legally sufficient where "the hypothesis of guilt * * * flow[s] naturally from the facts proved,

---

1. The District Attorney at trial, contrary to the argument urged on appeal, maintained that this was a "strong identification" case. His insistence on this point obviously impelled the court to charge identification as it did.

and [is] consistent with them; and the facts proved * * * exclude 'to a moral certainty' every reasonable hypothesis of innocence" *(People v Benzinger,* 36 NY2d 29, 32). Circumstantial evidence is frequently more reliable and stronger than direct proof by eyewitness testimony. *(People v Benzinger, supra,* p 32; *People v Leach,* 57 AD2d 332, 336, affd 46 NY2d 821.)* The focus in a circumstantial evidence case is not the relative strength or weakness of any particular piece of evidence, nor is it necessary for each evidentiary segment to point only to the hypothesis of guilt *(People v White,* 41 AD2d 629, affd 33 NY2d 996). Rather, the evidence must be considered in its entirety *(People v White, supra)* and, viewed in a manner most favorable to the People, must meet the test enunciated in *Benzinger (supra).* "In the end, it is a question whether common human experience would lead a reasonable man, putting his mind to it, to reject or accept the inferences asserted for the established facts" *(People v Wachowicz,* 22 NY2d 369, 372). This requirement does not add to the burden a prosecutor has in every criminal case to prove defendant's guilt beyond a reasonable doubt *(People v Bonifacio,* 190 NY 150, 153-155; cf. *People v Taddio,* 292 NY 488, 497), inasmuch as "absolute or metaphysical certainty" of guilt is not required *(People v Eckert,* 2 NY2d 126, 129). The rule instead draws a juror's "attention to the fact that proof by circumstantial evidence may require careful reasoning" *(People v Benzinger, supra; People v Leach, supra,* pp 336-337).

The requirements of the law will be satisfied "[i]f, after a careful and impartial consideration and comparison of the evidence, the jurors can say that they entertain no reasonable doubt of the defendant's guilt and, therefore, are convinced of it". *(People v Bonifacio, supra,* p 154.)

■ Applying these standards we will not say that the omission of eyewitness testimony from the incriminating scenario requires rejection of the indictment.

In *People v Brengard* (265 NY 100, 103) the following facts were found by the jury: "The parked car which the policeman found in the woods was the property of Brengard. His hat lay a few feet from the car. The bullet which entered Kennedy's body was shot from a revolver owned by Brengard. A day or two after the shooting, as he admitted, he filed certain identifying numbers from this weapon and hid it in a chicken coop at his home. He did not take the stand as a witness, but in statements made to the authorities he denied that he was

present at the scene of the assault and at first denied that French had ever been out in his car but later asserted as an explanation for the presence of his car and his hat in the woods where Kennedy had been shot and the fact that it was his revolver with which the assault had been committed, that he had loaned his car to French for the purpose of visiting friends and that his hat and revolver were in it at the time. He stated that on the night of the assault he had been training for a prize fight at a gymnasium but no witness came forward at the trial to testify to such a fact. His parents and a friendly neighbor, however, did swear that he was at home when the shooting occurred but their credibility was for the jury. In reply to the question, asked by a police officer, why French should accuse him of the shooting, as French had done in his presence, he answered that French associated with some people who might want to get even with him."

Obviously, despite the absence of eyewitness testimony, the Court of Appeals found the circumstantial evidence in *Brengard* a sufficient basis to support a finding of first degree murder upon facts not too different from those before us.[2]

At the trial herein the People's proof established that two men participated in the killing of Ensulo, and that defendant "most resembles" one of them. The evidence also traced the killers' escape from the scene of the murder on West 57th Street in a red car, to their attempt to elude detection by burning the car on West 37th Street and further flight in defendant's white automobile. Defendant admitted to the police a few days after the murder that the white automobile belonged to him on April 14 and that only he and his wife had the keys to it, although he maintained it had not been used on the day of the murder. Moreover, defendant had a strong motive to kill the deceased and on a previous occasion had indeed tried to kill him by firing a weapon.

Although there was testimony which, if credited, placed defendant at the place of his employment during the morning of April 14, 1978, nevertheless, it was for the jury to determine whether the evidence offered through the People's wit-

---

2. Under section 1044 of the former Penal Law a conviction for first degree murder required that the killing of another be the result of premeditation and deliberation, elements not required under the present law of murder (Penal Law, §§ 125.25 and 125.27). The penalty for the crime of murder in the first degree was death (former Penal Law, § 1045).

nesses to establish defendant's guilt excluded to a "moral certainty every reasonable hypothesis of innocence."

Weighing such circumstances, the jury by careful reasoning, like the jury in *Brengard (supra)* could be "justified in drawing inferences beyond a reasonable doubt that [Gallo] was present at the time of the attack and that [a] hand which discharged the weapon was the hand of [Gallo]" *(People v Brengard, supra,* p 103). Whether this evidence would satisfy a jury beyond a reasonable doubt is not the question now before us.

The trial court in its posttrial opinion after the jury had disagreed dismissed the indictment because it found the evidence at trial, which was wholly circumstantial, insufficient to support the indictment. In coming to its conclusion, the trial court, while crediting all the evidence most favorably to the People, held that a finding of guilt could not be based upon such evidence.

But we note that at the time the court dismissed the indictment, the jury had been discharged and a mistrial declared.[3] Although the criminal procedure under New York and Federal practice differs, what occurred below is analogous to that which took place at the trial level in *United States v Sanford* (429 US 14). There, too, a jury was unable to agree on a verdict, a mistrial was declared and the Trial Judge, months later, dismissed the indictment.

The United States Supreme Court held (pp 15-16):

"The trial of respondents on the indictment terminated, not in their favor, but in a mistrial declared *sua sponte,* by the District Court *[id.,* 15]. Where the trial is terminated in this manner, the classical test for determining whether the defendants may be retried without violating the Double Jeopardy Clause is stated in Mr. Justice Story's opinion of this Court in *United States v. Perez,* 9 Wheat. 579, 580 (1824): 'We are of the opinion, that the facts constitute no legal bar to a future trial. The prisoner has not been convicted or acquitted, and may again be put upon his defence. We think, that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into con-

---

3. Although the trial transcript does not recite that a mistrial was declared, the court clerk's minutes for January 31, 1979 read "10:40—Jury Discharged—Mistrial."

sideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated.' * * *

"The situation of a hung jury presented here is precisely the situation that was presented in *Perez, supra,* and therefore the Double Jeopardy Clause does not bar retrial of these respondents on the indictment which had been returned against them."

The Supreme Court ruled that the District Court's dismissal of the indictment occurred months after the first trial ended in a mistrial but before a retrial had begun; that the dismissal was prior to a trial that the Government had a right to prosecute and that the defendant was required to defend. Since in such a case a trial following the Government's successful appeal of a dismissal is not barred by double jeopardy, there can be an appeal from the dismissal under Federal statutes (US Code, tit 18, § 3731).

█ In our opinion, the order of dismissal by the trial court was made at a time when the indictment was in a pretrial stage, that is, prior to a second trial (CPL 310.60, subd 2). The order of dismissal then, could not be under any interpretation, a resolution of the facts during trial in favor of the defendant, tantamount to an acquittal (cf. *People v Brown,* 40 NY2d 381). Rather, it was at most an erroneous determination of law by the court subsequent to the termination of the trial. (See Denzer, Practice Commentary, McKinney's Cons Laws of NY, Book 11A, CPL 290.10.) In the circumstances, it was an order from which an appeal could be taken by the People (CPL 450.20, subd 2) without being confronted by the double jeopardy clause (US Const, 5th and 14th Amdts; NY Const, art I, § 6). Hence a retrial is not constitutionally proscribed (see *Serfass v United States,* 420 US 377; *United States v Sanford,* 421 US 996).

Accordingly, the order of the Supreme Court, New York County (McQUILLAN, J.), entered April 18, 1979, dismissing the indictment should be reversed, on the law, the indictment reinstated and the matter remanded for a new trial in accordance with this opinion.

KUPFERMAN, J. P., SANDLER, ROSS and MARKEWICH, JJ., concur.

the matter remanded for a new trial in accordance with the opinion of this court.