# THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v FRANK CABLE and DENISE GODBEE, Appellants.

First Department, November 10, 1983

APPEARANCES OF COUNSEL

*Joyce P. Adolfsen* of counsel (*John Latella* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

*Bernard V. Kleinman* for Frank Cable, appellant.

*Ronna D. Brown* of counsel (*William E. Hellerstein,* attorney), for Denise Godbee, appellant.

### OPINION OF THE COURT

SULLIVAN, J. P.

Defendants Denise Godbee and Frank Cable stand convicted of felony murder and related offenses arising out of the armed robbery of Mr. and Mrs. Arnold Weiner, an elderly couple, in their Manhattan apartment, in the course of which the victims were bound and threatened with a knife. Two days later Mr. Weiner, who had been struck on the head during the robbery, died as a result of a heart attack. The principal issue is the sufficiency of the proof offered to establish that the stress of the robbery caused the fatal heart attack.

In June, 1980 Godbee began working as a maid for Maria Kiper, who resided on the sixth floor at 155 Riverside Drive in Manhattan. Shortly thereafter, Mrs. Kiper recommended Godbee to Anna Weiner and her husband Arnold, a retired diamond merchant, who were looking for a maid. The Weiners, a couple in their late 80's, lived on the tenth floor in the same apartment building. Godbee worked for the Weiners for the first time on Wednesday, July 9, 1980.

Two weeks later on July 23, 1980, at about 8:55 A.M., Cable, who at the time was sharing a room with Godbee,

his fiancé, at the Hotel Lawrence in Rockaway Park, was observed entering 155 Riverside Drive. A few minutes later Godbee entered the building and the two rode up in the elevator together to the tenth floor.

After being admitted to the apartment and finding Mr. Weiner in his bedroom, reading the newspaper as was his early morning custom, Godbee, as she had done two weeks earlier, left the Weiners' apartment door closed but unlocked while she went downstairs to deliver a newspaper to Mrs. Kiper. During Godbee's absence a male intruder, who the jury by its verdict determined to be Cable, entered the Weiner apartment and at knifepoint tied up the Weiners. Apparently Godbee returned to the apartment sometime during the incident. Mrs. Weiner, who had a limited recollection of the incident, awakened to find herself and her husband, both bound, lying on the living room floor. She asked Godbee, who was sitting in a chair, to call the superintendent. Godbee replied that she had already called the police. Meanwhile, about 20 minutes after he had entered the building, Cable was seen leaving. As he walked past the doorman he attempted to cover his face with his hands.

When the police arrived, they found Mr. Weiner, who had been tied up with a necktie, disheveled and bleeding from the mouth. He had to be taken to Roosevelt Hospital, where he was treated for cuts and bruises. Mrs. Weiner's dress was torn and in disarray. A search of the apartment revealed that a small amount of money was missing, as well as three diamond rings; a wedding band with a diamond studded platinum setting; a pearl and diamond ring set in platinum; and a cocktail ring featuring rubies and diamond baguettes set in platinum around a large center diamond. A gold wedding band, a gold pocket watch and two pairs of cufflinks were also missing.

A few hours after the robbery Cable sold an old pearl platinum ring with the name "Weiner" engraved thereon at a jewelry store located across the street from the Hotel Lawrence. Cable returned the next day and sold an antique diamond ring set in white gold but later reclaimed the ring when payment on the jeweler's $195 check was refused for insufficient funds. That same day he went to another

jewelry store in the vicinity and sold two rings, one, a single 50-point diamond ring, the other, a wedding band with diamond baguettes.

Mr. Weiner remained in his apartment until the evening of the next day when, complaining of pain in the left lateral lower chest, just above the waist, he went to see his physician, Dr. Liebling, who noted an abrasion on his lower lip. Mr. Weiner spent the following day in bed. When he awoke at 5 P.M., after napping, he complained of not feeling well. Dr. Liebling was summoned. When he arrived he found Mr. Weiner pale, clammy and not responsive to questions. Dr. Liebling immediately sent for the paramedics, who unsuccessfully attempted closed heart resuscitation. Mr. Weiner was declared dead at 6:15 P.M.

According to Dr. Liebling, Mr. Weiner, who had been his patient since 1976, was overweight and suffered from glaucoma in both eyes, a cataract in his right eye and an umbilical hernia. Dr. Liebling had not ordered an EKG when he examined Mr. Weiner on the day after the robbery. Nor, in the years he had treated Mr. Weiner, had Dr. Leibling ever detected any signs of heart disease.

Dr. Elliot Gross, the Chief Medical Examiner for New York City, performed an autopsy on Mr. Weiner and found the presence of arteriosclerosis, hardening of the arteries, in the coronary arteries, the vessels which carry blood to supply the heart. Dr. Gross also found a clot in one of the heart vessels, and an infarct, which is a dead portion of the heart muscle, usually caused by a diminished blood supply to the area affected. The color of the infarct and the lack of any incipient scar tissue indicated to Dr. Gross that the infarct had occurred about 48 hours before Mr. Weiner's death. In his opinion, the myocardial infarction was the cause of death.

Dr. Steven Factor, a pathologist and associate professor at Albert Einstein College of Medicine, testifying for the defense, concurred in Dr. Gross' conclusion that Mr. Weiner's death was caused by a myocardial infarction, but disagreed as to the age of the infarct. Dr. Factor explained that in his review of the slides of Mr. Weiner's heart tissue he saw a greater number of white cells, known as leucocytes, than he would have expected had the infarct been

only 48 hours old. In addition, the leucocytes had begun to break down and Dr. Factor noted the presence of other cells, known as fibroblasts and macrophages, at the periphery of the infarct. According to Dr. Factor leucocytes, the first cells to appear at the damage site after a myocardial infarction, increase in number up to 48 hours or perhaps even up to 72 hours before beginning to break down. After 72 to 96 hours fibroblasts, which form scar tissue, and macrophages, which "eat" the debris in the infarct area, begin to appear. Thus, the breakdown of the leucocytes and the presence of scavenger cells suggested to Dr. Factor that the infarct was three to four days old. While Dr. Gross' microscopic examination of Mr. Weiner's heart tissue had shown an influx of leucocytes he had not found any evidence of fibroblasts.

On the issue of causality Dr. Factor testified that a myocardial infarction could be the result of arteriosclerosis, a spasm of the coronary artery, a blood clot, or extreme emotional stress. In his view, however, no one could, with certainty, state that the stress of the robbery led directly to Mr. Weiner's infarct. According to Dr. Factor most fatal infarcts occur at a time when the victim is completely at rest.

On rebuttal Dr. Millard Hyland, Deputy Chief Medical Examiner for Manhattan and Staten Island, testified that the microscopic tissue samples and photomicrographs indicated that the infarct was two or two and one-half days old. His opinion was based on the presence of leucocytes and only a few scattered macrophages, which sometimes arrive early with the leucocytes, and the absence of fibroblasts. Dr. Hyland also noted that the red blood cells of the clot had not yet broken up; nor had scar tissue begun to form at the clot's edges. With a reasonable degree of medical certainty he stated that the emotional and physical trauma suffered by Mr. Weiner caused the heart attack.

■ Before the issue of causal connection between the robbery and Mr. Weiner's death is addressed, the extent of Godbee's role in the crime must be considered since she argues that the People failed to prove her guilt as an accessory. In our view the evidence was sufficient to justify the jury's finding that her complicity was that of an acces-

sory, rather than, as she contends, of a mere bystander with guilty knowledge (see *People v Reyes*, 82 AD2d 925, 926; *Matter of Victor M.*, 68 AD2d 837). A person is criminally liable for an offense when, acting with the requisite mental culpability, he intentionally aids another person to engage in conduct which constitutes an offense. (Penal Law, § 20.00.)

The evidence amply demonstrates that Godbee intentionally aided Cable in the robbery of the Weiners and the burglary of their apartment. It is undisputed that she left the door to the apartment unlocked, thereby providing access for him, and although they had arrived separately at the apartment building that morning, they rode upstairs together in the same elevator. In light of such evidence the notion that Cable randomly selected the Weiner apartment to burglarize was properly rejected by the jury.

Godbee's participation was not, however, limited to leaving an apartment door unlocked. Instead of immediately alerting the doorman or building superintendent after Cable left the apartment, she called the police. When the police failed to respond promptly she called them again without alerting the building personnel. Thus, Godbee's actions could be seen as part of a design to ensure that Cable fled the building safely.

Godbee also provided the police officers with a misleading description of the robber. She told them he was a clean shaven male Hispanic in his 30's, 6 feet or 6 feet 1 inch tall, weighing 185 pounds. In fact, as the jury could see 'for itself, Cable was approximately 5 feet 8 inches tall and weighed about 160 pounds. Finally, upon learning that police officers were asking questions about her at the hotel, Godbee moved without leaving a forwarding address. The jury could consider her actions as evidence of flight evincing a consciousness of guilt. (See *People v Lipsky*, 57 NY2d 560, 571.)

While Godbee's guilt as an accomplice was proven we find that the People failed to establish beyond a reasonable doubt that Mr. Weiner's heart attack was caused by the stress of the robbery. At the outset we take note of the hypothetical question posed to the People's expert, Dr. Gross: "Doctor, if there were a man someplace between 85

and 90 years old, and if this man had been married for a period of something around 60 years and if this person, this man were in his home and his home were invaded by a burglar, a burglar who threatened him and his wife, and if this person were tied up, is it, in your medical opinion, a possibility that such a man might suffer a mild cardio infarction which would not show up for a period of around two days later?" Dr. Gross answered, "Yes, it's a possibility." Furthermore, on cross-examination, Dr. Gross conceded that the infarct could have been caused without any excitement or trauma at all. Even Dr. Hyland, called by the People on rebuttal, conceded, "There is the possibility of other causes".

The law on proximate cause is well settled. "[T]he defendants' actions must be a *sufficiently direct cause* of the ensuing death before there can be any imposition of criminal liability". (*People v Kibbe,* 35 NY2d 407, 413.) "[T]he prosecutor must * * * prove that the defendant's conduct was an actual cause of death, in the sense that it forged a link in the chain of causes which actually brought about the death". (*People v Stewart,* 40 NY2d 692, 697.)

In *People v Kane* (213 NY 260), the defendant shot a pregnant woman, causing her to miscarry. She died three days later from septic peritonitis which had been induced by the miscarriage. The court concluded that a direct chain of causation linked the gunshot wounds, with their complications, to the victim's death. Similarly, in *People v Caprio* (47 AD2d 1), where the victim, a child, died within hours of brain surgery from the stress of the operation, the court found a causal link between the defendant's persistent brutality toward the child and the surgery which was necessary to treat the injuries resulting therefrom. In *People v Parody* (248 App Div 269), the defendant, intoxicated, struck a pedestrian with a car, causing fractures of both legs which, four weeks later, required surgery. The victim died of shock four hours after the operation. Again, the court found a direct connection between the defendant's acts and the victim's death in the aftermath of the surgery.

While a defendant may be criminally liable even if death does not immediately follow injury, a definite link must be

forged between the original injury and the fatal result. One of the leading cases in this area is *People v Brengard* (265 NY 100). Almost four years after he was shot, the victim died from cardiac failure due to an embolism, but in the intervening years he had suffered paralysis of his legs, lost control of his bladder and bowels, and eventually had his right leg amputated. All his ailments were directly attributable to the shooting. The attending physician testified (*supra,* p 104), " 'The producing cause of death was the gunshot wound in the spinal column * * * The minute that bullet struck his back he started to die then and that is just the last thing that happened.' " The court noted (p 105), "Even without expert opinion evidence, the jury could decline to entertain any reasonable doubt that it was the bullet wound which caused his death."

The difference between this line of cases and the instant case can be seen clearly in *People v Roberts* (73 AD2d 954). There, the defendant's murder conviction was upheld where the victim, an otherwise healthy man, exhibited the symptoms of a heart attack moments after a robbery, and died the following day of a myocardial infarction caused by stress. Unlike the victim in that case Mr. Weiner did not display, even to his doctor, any symptoms of a heart attack clearly referable to the robbery, in the period after the robbery until his demise almost two and one-half days later. Moreover, the autopsy revealed the presence of physical deterioration, such as arteriosclerosis which, the medical experts concede, could also have caused the infarct. Moreover, Mr. Weiner's heart had scar tissue, indicating prior minor infarcts.

Most significant though, while in *Roberts* (*supra*) the experts testified that the victim's heart attack was caused by stress, in the instant case Dr. Gross, the prosecution's only medical expert on their case-in-chief, testified that a direct causal connection between the robbery and the subsequent heart attack was no more than "merely possible". He also testified that he was reasonably certain the cause of death was "an occlusive coronary arteriosclerosis with a recent * * * [clot] and infarct." Although he believed they were related Dr. Gross could not state which came first, the clot or the infarct. If the clot preceded the infarct, then, in

all likelihood, it caused the infarct by cutting off the supply of blood to the affected area. Dr. Gross admitted, however, that a blood clot may develop from a number of causes, only one of which is shock. Since the record is bereft of any evidence from which to conclude that if, indeed, the clot came first, it stemmed from the stress of the robbery, the possibility that it did not, standing alone, is sufficient to create a reasonable doubt about the prosecution's theory of causation.

On the other hand, according to Dr. Gross, an infarct may cause a clot. In such cases the flow of blood through the damaged area is slowed, causing the blood to turn to a sludge which may eventually form a clot. The experts disagreed, however, as to when the infarct itself actually occurred. Dr. Gross testified the infarct could have preceded death by 44 to 54 hours, while Dr. Factor, the defense expert, determined that it occurred 72 to 96 hours before death, and Dr. Hyland, the prosecution's rebuttal witness, was of the opinion that the infarct was 36 to 72 hours old at the time of death. Mr. Weiner died approximately 56 to 57 hours after the robbery. Even if the estimates of Doctors Gross and Hyland were correct, however, the stress of the robbery remains only a potential cause of the infarct, along with such other possibilities, according to Dr. Gross, as arteriosclerosis, sudden exercise, physical strain or emotional stress. Even the rebuttal witness, Dr. Hyland, presumably summoned to rehabilitate the People's case, and although able to articulate with medical certainty the hypothesis that the stress of the robbery caused the heart attack, conceded that he did not know what biological mechanism caused the infarct. Notwithstanding his "common sense certainty" that the robbery was the cause of death this record does not dispel the reasonable doubt that Mr. Weiner's heart attack was, in fact, attributable to some other cause, such as arteriosclerosis, from which he suffered, and which can lead to death by creation of an infarct.

Since the People's expert testimony failed sufficiently to establish an actual direct causal relationship between the stress of the robbery and the heart attack, their proof fails. "The proximate relationship must * * * be clearly proved beyond a reasonable doubt." (*People v Brengard,* 265 NY

100, 108, *supra.*) "[A]n 'obscure or merely probable connection between an assault and death will, as in every case of alleged crime, require acquittal of the charge of any degree of homicide' ". (*People v Stewart,* 40 NY2d 692, 697, *supra,* citing *People v Brengard, supra,* p 108.) The fact that the conjecture is by an expert does not make it any more persuasive. In *People v Harding* (59 AD2d 897, 898), where the operability of a gun was at issue, the court stated, "[e]xpert opinion evidence lacks probative force where the conclusions are contingent, speculative or merely possible". Accordingly, we vacate both defendants' convictions for felony murder and manslaughter as well as for robbery in the first degree, which was predicated on a violation of subdivision 1 of section 160.15 of the Penal Law, viz., in the course of the commission of the robbery "[causing] serious physical injury to any person who is not a participant in the crime". This conviction cannot stand since the only serious injury proven is Mr. Weiner's death, for which defendants are not responsible.[1] The charges underlying these vacated convictions are dismissed.

■ Even if we were not vacating the felony murder convictions and dismissing that charge for legal insufficiency we would order a new trial thereon for Godbee who requested, and was refused, a charge on the affirmative defense to felony murder, as provided in subdivision 3 of section 125.25 of the Penal Law. The defense is established in any prosecution of a defendant who was not the only participant in the underlying crime if such defendant shows that he did not commit the homicidal act nor in any way solicit, request, command, importune, cause or aid the commission thereof; was not armed with a deadly weapon or dangerous instrument; did not have any reasonable ground to believe that any other participant was so armed; and did not have any reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

While a defendant has the burden of proving the affirmative defense by a preponderance of the evidence (Penal

---

1. The evidence as to Mr. Weiner's other injuries is insufficient to warrant a modification of the conviction to the lesser included offense of robbery in the second degree predicated on "[causing] physical injury" (Penal Law, § 160.10, subd 2, par [a]), as is authorized by CPL 470.15 (subd 2, par [a]).

Law, § 25.00, subd 2), the proof can come from any witness — prosecution or defense. (*People v Smith,* 55 NY2d 888.) Under the circumstances the jury could find that Godbee met each of these four conditions. The evidence shows that Godbee sat passively during the robbery. She did not aid in tying up Mr. Weiner; nor did she strike him. She was not herself armed with a deadly weapon, nor does the evidence show that she knew Cable was so armed. Finally, a jury could well conclude that Godbee was unaware that the robbery would likely result in death or serious physical injury. Thus, a " 'reasonable view of the evidence' " exists to support the affirmative defense. (See *People v Edwards,* 64 AD2d 201, 202.)

Godbee also cites as error the court's refusal to submit criminal facilitation in the second degree[2] as a lesser included offense of all the counts of the indictment. She claims a right to such a submission since all the charges against her are premised upon a theory of accessorial liability. If she is correct the refusal so to charge would affect the two convictions, robbery in the second degree and burglary in the second degree, left undisturbed by the People's deficiency in proof in causally relating Mr. Weiner's death to the robbery. Nevertheless, proper analysis of the issue requires us to consider the request to submit criminal facilitation as a lesser included offense as though the other charges had not been dismissed.

In *People v Glover* (57 NY2d 61) the Court of Appeals set forth two criteria for determining when a crime must be submitted to the jury as a lesser included offense. Disavowing its prior decisions[3] which had resolved the initial inquiry into whether the specific offense meets the definition of a lesser included offense contained in CPL 1.20 (subd 37) by an examination of the criminal transaction on which the particular prosecution was predicated, the court held that the defendant must first demonstrate by an abstract comparison of the statutes defining the two crimes

---

**2.** Subdivision 1 of section 115.00 of the Penal Law provides: "A person is guilty of criminal facilitation in the fourth degree when, believing it probable that he is rendering aid:

"1. to a person who intends to commit a crime, he engages in conduct which provides such person with means or opportunity for the commission thereof and which in fact aids such person to commit a felony."

**3.** See, e.g., *People v Johnson,* 39 NY2d 364; *People v Cionek,* 35 NY2d 924; *People v Hayes,* 35 NY2d 907.

that it is impossible to commit the greater offense without concomitantly, by the same conduct, committing the lesser. If the defendant succeeds in making such a showing, then in accordance with CPL 300.50 (subd 1), he must demonstrate that a reasonable view of the evidence exists in the particular case which would support a finding that he committed the lesser offense but not the greater (57 NY2d, at p 64).

■ Thus, it is clear that it would be theoretically possible for a defendant to commit felony murder (Penal Law, § 125.25, subd 3), manslaughter in the second degree (Penal Law, § 125.15, subd 1), robbery in the first degree (Penal Law, § 160.15, subd 1), and burglary in the second degree (Penal Law, § 140.25, subd 1, par [b]) all of which were submitted to the jury, without in fact aiding another person to commit those crimes. Accordingly, criminal facilitation is not a lesser included offense of those crimes and the court properly refused to submit it.

While it would be theoretically impossible for a defendant to commit robbery in the second degree (Penal Law, § 160.10, subd 1 [aided by another person actually present]) without also committing criminal facilitation, there is, in our opinion, no reasonable view of the evidence to conclude that Godbee facilitated a robbery by leaving the apartment door unlocked, yet was not acting with the requisite mental culpability for accessorial liability, i.e., the intent to aid in the commission of a robbery. Moreover, having been found guilty of the other crimes charged, all of which required a finding by the jury that she intentionally aided Cable, Godbee was not prejudiced by the court's refusal to charge criminal facilitation as a lesser crime of robbery in the second degree. (See *People v Granger,* 187 NY 67; cf. *People v Green,* 56 NY2d 427.)

We have examined the other contentions raised and find that they are without merit. Accordingly, the judgment of the Supreme Court, New York County (Torres, J.), rendered November 19, 1981, which convicted defendants of murder in the second degree (felony murder), manslaughter in the second degree, robbery in the first and second degrees, and burglary in the second degree and sentenced defendant Cable thereupon to concurrent indeterminate

terms of 20 years to life imprisonment, 7½ to 15 years, 10 to 20 years, 7½ to 15 years and 7½ to 15 years, respectively, and defendant Godbee to concurrent indeterminate terms of 15 years to life imprisonment on the murder conviction, 5 to 15 years on the robbery in the first degree conviction, and 4 to 12 years on each of the remaining convictions, should be modified, on the law, to reverse that part of the judgment convicting defendants of the crimes of murder in the second degree, manslaughter in the second degree and robbery in the first degree, and to vacate said convictions and dismiss the charges underlying them and, except as thus modified, affirmed.

Asch, J. (dissenting). I disagree with the majority only on the issue of whether the People proved beyond a reasonable doubt that the stress of the robbery and burglary caused the heart attack and subsequent death of Mr. Weiner. On the record before the court, there was proof beyond a reasonable doubt to support a jury determination that the defendants' actions caused or were at least a contributory cause of the fatality.

At the time of the robbery, Mr. Weiner, although 89 years old, was functioning well. His physician, Dr. Leibling, testified that Weiner was in good general health and *had never* complained of chest pains or heart trouble during the period Dr. Leibling had been his physician, approximately four years at the time of the crime.

During the burglary and robbery, Mr. Weiner was struck in the face. Both he and his wife were tied up and forced at knifepoint to lie on the floor.

The very next evening Mr. Weiner visited Dr. Leibling complaining of a pain in the chest. The following afternoon he was dead. The undisputed cause of death was a myocardial infarction. Each one of the medical experts who testified agreed that a myocardial infarction could be caused by stress and emotional excitement. The testimony of two of the medical experts who testified for the People was that the infarct had occurred about 48 hours before Mr. Weiner's death — the time the robbery and burglary took place. This is especially significant in view of the testimony of the People's expert, Dr. Gross, referred to in the majority opinion. In response to a hypothetical question of whether

a person in Weiner's condition and under the circumstances of the case herein might suffer a myocardial infarction which would not show up for a period of around two days later, Dr. Gross answered, "Yes, its a possibility." This hypothetical question was asked and answered to establish that an infarction could have taken place at the time of the robbery and then manifested itself some two days later.

Thus, the prosecutor in a sidebar conference, before asking the hypothetical question, informed the court that she would "ask if, in his medical opinion, myocardial infarction could have been precipitated which did not manifest itself until 48 to 50 hours later." Accordingly, Dr. Gross' answer actually strengthened the proof that "the defendant's conduct was an actual cause of death, in the sense that it forged a link in the chain of causes which actually brought about the death" (*People v Stewart*, 40 NY2d 692, 697). Likewise, the majority's insistence on the "concessions" by both Dr. Gross and Dr. Hyland, called by the People on rebuttal, that the infarct could *possibly* have occurred through other causes, does not negate the jury's finding that the proximate cause of the infarct was beyond a reasonable doubt the action of defendant.

Dr. Hyland testified that: "My opinion is that the emotional and physical trauma that this man suffered brought upon his heart attack." Simply because there are numerous possible causes of a heart attack does not mean the People failed to prove the proximate relationship between the stress of the robbery and the death from the myocardial infarction. Dr. Hyland when asked "[i]s it ever possible with absolute certainty to state which of these things [possible causes] has occurred to cause the myocardial infarction?" answered "No, it is not." The quantum of proof needed is not "absolute certainty" excluding every other "possibility" but proof "to support a jury determination beyond a reasonable doubt that defendant's actions caused or were at least a contributing cause of the fatality" (*People v Cicchetti*, 44 NY2d 803, 805).

As the Court of Appeals said recently: "The standard for reviewing the legal sufficiency of evidence in a criminal case is whether 'after viewing the evidence in the light

most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' (*Jackson v Virginia,* 443 US 307, 319 [emphasis in original])." (*People v Contes,* 60 NY2d 620, 621.)

A review of the evidence herein certainly shows that the jury could have found the essential elements of the crime beyond a reasonable doubt, especially after viewing, as the standard requires, the evidence in the light most favorable to the prosecution.

The record before the court showed medical testimony that death was attributable to myocardial infarction arising 48 hours prior, coinciding with the robbery and burglary on July 23, 1980. The fact that an 89-year-old man suffered from hardening of the arteries which may have contributed to his death does not relieve the defendants of responsibility. Perpetrators of violent crime, often reflecting a calculated *modus operandi,* prey on the infirm and disabled, the ones least likely to resist or whose resistance can most easily be overcome. These felons who use the age and physical condition of their victims to their own advantage, should likewise assume the legal consequences of any serious injury or death which is more likely to take place.

This court in *Matter of Anthony M.* (97 AD2d 989), released simultaneously herewith, affirmed without opinion the order of Family Court adjudicating a minor a juvenile delinquent upon a finding the minor had committed an act, which if done by an adult, would have constituted the crime of manslaughter in the second degree.

In that case, the juvenile grabbed the purse of an 83-year-old woman with such ferocity that she was thrown to the pavement and dragged several feet. The woman was removed to the hospital and the next day underwent surgery to correct a fracture of the left femur. Six days after surgery she suffered a massive heart attack and died two days later. In that case the medical testimony showed "severe generalized arteriosclerosis * * * enlarged heart * * * old and recent myocardial infarction." Also, the medical examiner admitted that the victim's death could have resulted from her generalized arteriosclerosis with 90%

occlusion at any time even in the absence of any external stress factors.

However, as in the instant case, there was a clear and distinct chain of causality between the acts of the accused and the ensuing death. If this court upheld the conviction in the appeal of *Matter of Anthony M. (supra)*, assuredly, it should do so in the matter before us now.

As the jury found, a finding supported by the testimony of Dr. Gross and Dr. Hyland, the defendants by their criminal acts set into motion the sequence of physical changes in Mr. Weiner's body, whether exacerbated or not by pre-existing conditions, which led inexorably to his death two days later.

Accordingly, the judgment of the Supreme Court, New York County (TORRES, J.), rendered November 19, 1981, convicting defendants of murder in the second degree (felony murder), manslaughter in the second degree, robbery in the first and second degrees, and burglary in the second degree, and sentencing defendant Cable to concurrent indeterminate terms of 20 years to life, 7½ to 15 years, 10 to 20 years, 7½ to 15 years and 7½ to 15 years, respectively, and defendant Godbee to concurrent indeterminate terms of 15 years to life on the murder conviction, 5 to 15 years on the robbery in the first degree conviction and 4 to 12 years on each of the remaining convictions, should be affirmed in its entirety.

CARRO and KASSAL, JJ., concur with SULLIVAN, J. P.; ROSS and ASCH, JJ., dissent in an opinion by ASCH, J.

Judgment, Supreme Court, New York County, rendered on November 19, 1981, modified, on the law, to reverse that part of the judgment convicting defendants of the crimes of murder in the second degree, manslaughter in the second degree and robbery in the first degree, and to vacate said convictions and dismiss the charges underlying them and, except as thus modified, affirmed.