Wachtler, J.
The defendant was charged with stabbing and killing Daniel Smith. There is no doubt that the defendant stabbed Smith and that Smith later died at a hospital. However at trial one of the principal issues was whether the stab wound caused the death, or whether death was caused solely by medical malpractice at the hospital or by other intervening effective medical cause. The jury after being charged to consider several alternative counts of assault and homicide found the defendant guilty of manslaughter in the first degree. On this appeal the defendant urges that the evidence was only sufficient to establish assault because the People failed, as a matter of law, to prove that the stab wound caused Smith’s death beyond a reasonable doubt.
The stabbing occurred when the defendant arrived unexpectedly at his former girlfriend’s Brooklyn apartment on the evening of October 8, 1971. He found Daniel Smith there and ordered him to leave at knife point. When Smith suggested that they talk it over, the defendant rejected the idea and stabbed him in the stomach. Smith was then taken to a Brooklyn hospital where he was operated on later that evening. The following day the defendant was arrested and charged with assault. On November 8, 1971 Smith died in the hospital and the defendant was charged with murder.
*694 At the trial the People called Dr. Dominck Di Maio, the Deputy Chief Medical Examiner for the Borough of Brooklyn, to establish the cause of death. Di Maio had not been present during the operation performed on October 8; but he had reviewed the reports of the surgeons and the anesthesiologist and had also performed an autopsy on November 10, 1971. Since neither the surgeons nor the anesthesiologist testified at the trial, the only evidence regarding the cause of death came from Di Maio and the reports of the operation, both of which were introduced into evidence.
Di Maio stated that when Smith entered the hospital he had a single knife wound in the abdomen which had punctured the stomach. Prior to the operation he was given "a substance which is commonly called Curare” which paralyzes the chest muscles making it impossible for the patient to breathe on his own. As a result, the anesthesiologist had to "breathe” for him by squeezing a bag of oxygen into the lungs, a procedure called ventilation. During the initial stages of the operation, the surgeons discovered that Smith also had an incarcerated hernia. After they had sutured the wounds and completed the operation on the stomach, the surgeons proceeded to correct the hernia. During this phase of the operation "it was noted that the body was turning blue and there was no pulse, which means the person went into cardiac arrest.” Smith then suffered a loss of oxygen to the brain and massive brain damage. He died a month later without ever regaining consciousness. At the time of death, the stomach wound had completedly healed. Nevertheless at the trial, and in his autopsy report, Di Maio stated that in his opinion death was caused by "a stab wound of the abdomen, stomach, cardiac arrest during surgical correction of the stab wound and another operation which was indicated during the surgical procedure with sepsis, which means infection, and kidney shut down.”
Thus Smith’s death was immediately caused by heart failure, with resulting massive brain damage, which occurred during the operation, and Di Maio concluded that the stab wound was ultimately responsible for this. But the heart failure had occurred after the surgeons had successfully closed the stomach wound inflicted by the defendant, and while they were correcting the hernia which, concededly, was not in any way related to the defendant’s act. Di Maio was asked whether this phase of the operation was also made necessary *695 by the defendant’s act. He had initially stated in conclusory terms that when the surgeons discovered that Smith had the hernia they "felt [it] should be operated upon or it would possibly endanger his life.” But later, more equivocally, he observed that "They saw that and they, I suppose, believed it might be a good thing to take care of that at the same time.” When asked whether it was a "correct medical decision” he said that it was because it is always proper "if you are in the belly, and you see something that may aggravate * * * or may complicate the condition you are operating for, you should do something about it.” Besides, he noted, the hernia might have become gangrenous and "If it did occur, they would have to go in again, and they would risk his life.” However when he was asked for his opinion as to whether the patient would have survived the operation if the surgeons had simply treated the stomach wound without "attending] to the additional hernia operation”, he answered "the chances are he would.”
Dr. Di Maio was also asked to explain exactly what had caused the cardiac arrest. Here he recognized several possibilities. It could have been caused by the shock of the stab wound or by the shock or physical strain of either or both of the operations. But it also could have been caused by something that occurred in the operating room. He initially stated that since he had not participated in the operation he did not "feel” that he should make any judgment on this. This reluctance was also prompted by the fact that "There is an anesthesia report which I have read, and there is a surgeon’s report, which I have read, and they are in direct contradiction”.
The anesthesiologist’s report stated that Smith had experienced a "broncho spasm” which, Di Maio explained, could have blocked the air passage making it impossible for the anesthesiologist to ventilate the patient. The surgeons’ report on the other hand stated that when they noticed the patient’s color change they asked the anesthesiologist "about the status of the patient, [and] he said he had difficulty ventilating the patient. It was the opinion of all three surgeons at the table that the anesthesiologist was in complete unawareness of what happened to the patient. When we investigated the situation first, the diaphragm was not moving and the patient was not being assisted with ventilation.” Finally Di Maio concluded "Now these are the two contradictions. If the anes *696 thesiologist is correct, and I have to assume so, there was a bronchial spasm, the diaphragm couldn’t move because he couldn’t get the air beyond the obstruction.” (Italics supplied.) However on cross-examination he conceded that if the anesthesiologist was not doing his job so that the patient "wasn’t getting any ventilation” or oxygen, he could suffer cardiac arrest, and that alone could be "the competent producing cause of death.”
At the conclusion of the trial the court submitted various counts to the jury including common-law murder, manslaughter in the first degree[1] and assault in the first degree.[2] As indicated they found the defendant guilty of manslaughter in the first degree on the theory that he assaulted Daniel Smith to inflict serious physical injury and, without intending to do so, caused his death.
The Appellate Division affirmed by a bare majority.
We have recently observed that there is "no statutory provision regarding the effect of an intervening cause of injury as it relates to the criminal responsibility of one who sets in motion the machinery which ultimately results in the victim’s death; and there is surprisingly little case law dealing with the subject” (People v Kibbe, 35 NY2d 407, 412). The concept of causation, although frequently considered and discussed in civil cases, is rarely encountered in criminal law (see, e.g., Ryu, Causation in Criminal Law, 106 U of Pa L Rev 773). It has been suggested that the criminal concepts involved are less complex than the civil (Hall, General Principles of Criminal Law [2d ed], p 254), but the burden of proof is more demanding and analogies are "neither controlling nor dispositive” (People v Kibbe, supra, p 412). In criminal cases questions of causation only arise when the crime charged involves not only conduct—and usually intent—but also proof that a specific harm has resulted (see La Fave and Hall, Criminal Law, p 247). Typically the cases in which the problems arise involve homicide.
*697 One accused of homicide, of course, cannot be convicted unless it is shown that he "cause[d] the death of a person” (Penal Law, § 125.00). No matter what degree of homicide is charged this is always an essential element which the People must prove beyond a reasonable doubt (People v Brengard, 265 NY 100, 108). This means that the prosecutor must, at least, prove that the defendant’s conduct was an actual cause of death, in the sense that it forged a link in the chain of causes which actually brought about the death (see, e.g., Perkins, Criminal Law, 687). But something more is required before his conduct will be recognized as a legal cause of death warranting criminal sanctions. The requirement here is that "the defendant’s actions must be a sufficiently direct cause of the ensuing death before there can be any imposition of criminal liability” (People v Kibbe, supra, at p 413). Thus an "obscure or merely probable connection between an assault and death will, as in every case of alleged crime, require acquittal of the charge of any degree of homicide” (People v Brengard, supra, p 108).
We have held that "direct” does not mean "immediate”. The defendant may be held to have caused the death even though it does not immediately follow the injury (see, e.g., Cox v People, 80 NY 500; People v Brengard, supra). Neither does "direct” mean "unaided” for the defendant will be held liable for the death although other factors, entering after the injury, have contributed to the fatal result. Thus if "felonious assault is operative as a cause of death, the causal co-operation of erroneous surgical or medical treatment does not relieve the assailant from liability for homicide” (People v Kane, 213 NY 260, 270). But if "the death is solely attributable to the secondary agency, and not at all induced by the primary one * * * its intervention constitutes a defense” (Kane, supra, at p 270).
In the Kane case the defendant shot a pregnant woman, Anna Klein, inflicting two "serious pistol-shot wounds”—one bullet lodged in the back three inches from the spine and the other fractured a rib and lodged in one of the lungs. The wounds caused a miscarriage; the miscarriage caused septic peritonitis and that lead to death. The defendant argued that the miscarriage and the blood poisoning had been caused by improper medical treatment. We held that there was no testimony that the miscarriage or the septic condition "was or could have been developed” as the defendant claimed. On the *698 other hand the evidence that was introduced was "sufficient to warrant the finding that the wounds inflicted by the defendant" operated as causes of death even though the medical treatment may also have had some causative influence” (Kane, supra, at p 277).
In Kane however we observed that if one of the interns at the hospital "had carelessly killed Anna Klein by the negligent administration of a deadly poison, the defendant would not have been liable for her death” (Kane, supra, at pp 270-271). Thus despite the fact that the defendant had inflicted serious wounds, he could not have been convicted if the death was solely attributable to grossly negligent treatment. This often presents a delicate question. Later in the Kane opinion (p 275) we cited with approval a case (Commonwealth v Eisenhower, 181 Pa 470) in which the defendant was held liable for homicide although there was evidence that a surgeon operating on the wound forgot to remove a drainage tube which later found its way into the spinal cord "and thus caused death.” The Pennsylvania court said (p 476) that even if this had occurred "’the prisoner cannot escape by showing that death was the result of an accident occurring in an operation which his felonious act made necessary.’ ”
One of the problems in the case now before us is that there is some question as to whether the operation on the hernia was made necessary by the defendant’s act. According to the testimony it was "medically correct”, arguably necessary, clearly incidental—but the hernia itself was absolutely unrelated to the stab wound. Dr. Di Maio conceded that the chances were that if it had not been performed, the patient would have survived. This type of necessity is obviously of a different order than is normally required to fix responsibility for homicide. It is, we believe, a factor we must consider in determining whether the causal relationship is sufficiently direct.
The other difficulty in the case is that it was never determined what actually caused the cardiac arrest. Dr. Di Maio acknowledged several possibilities which individually or combined could have created the condition. Most of the factors cited would indicate that the defendant’s act was responsible either because it created a physical strain or shock or created the need for an operation which had the same effect. But Dr. Di Maio conceded that there was some evidence that the anesthesiologist failed to provide oxygen to the patient and *699 that this alone could have been the cause of death. In our view if this occurred it was a grave neglect, perhaps gross negligence, but in any event sufficient to break whatever tenuous causal relationship existed at the time of this incidental operation. There is of course no showing that this was in fact the cause of death but on this record it cannot be ruled out as a possibility, certainly not beyond a reasonable doubt.
Finally it should be noted that this is not a case where two or more witnesses gave conflicting testimony which simply created a credibility question for the jury. Here all the evidence on this point came from a single prosecution witness who offered irreconcilable testimony pointing in both directions to guilt and innocence on the homicide charge (see, e.g., People v Ledwon, 153 NY 10; People v Reed, 40 NY2d 204). There was then no basis for the jury to find that the injury inflicted by the defendant caused the death of Daniel Smith, beyond a reasonable doubt.
Accordingly, the order of the Appellate Division should be modified by reducing the conviction from manslaughter in the first degree to assault in the first degree (Penal Law, § 120.10, subd 1) and the defendant should be resentenced (CPL 470.15, subd 2, par [a]; 470.20, subd 4; 470.40, subd 1).
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Fuchsberg and Cooke concur.
Order modified and case remitted to Supreme Court, Kings County, for resentence in accordance with the opinion herein and, as so modified, affirmed.

. On this count the court charged the jury under subdivision 1 of section 125.20 of the Penal Law which states: "A person is guilty of manslaughter in the first degree when * * * [w]ith intent to cause serious physical injury to another person, he causes the death of such person”.

. On this count the charge was pursuant to subdivision 1 of section 120.10 of the Penal Law which states: "A person is guilty of assault in the first degree when * * * [w]ith intent to cause serious physical injury to another person, he causes such injury to such person * * * by means of a deadly weapon or a dangerous instrument”.