**STATE of South Dakota, Plaintiff and Appellee,**

v.

**David WAFF, Defendant and Appellant.**

**No. 14336.**

Supreme Court of South Dakota.

Argued Sept. 11, 1984.

Decided July 31, 1985.

Mark Smith, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

Robert Van Norman, Rapid City, for defendant and appellant.

WOLLMAN, Justice.

Defendant was convicted by a Hughes County jury (venue having been changed

from Lawrence County) of conspiracy to commit murder in the first degree and of first-degree murder. The jury rejected the State's request that Waff be sentenced to death on the count of first-degree murder and instead recommended that he be sentenced to life imprisonment. SDCL 23A–27A–2; 23A–27A–4. Defendant has appealed. We affirm.

The charges against defendant were based upon the killing of Russell Keller on October 22, 1981. We set forth a full account of the circumstances that led to Keller's death in our opinion in *State v. Wiegers*, 373 N.W.2d 1 (S.D.1985), which we incorporate by reference here. Accordingly, we will set forth in this opinion only those facts that are necessary for an understanding of the issues raised by defendant.

In essence, the State's case against Waff was that he had been approached by one of his drug customers, Scott Whitesell, about killing Keller in exchange for the payment of money. Defendant initially demurred to this proposition, but later told Whitesell that he would perform the killing. Whitesell passed this information on to Donald Wiegers, who in turn told Keith Iwan that he had found someone who would kill Keller. Iwan passed this information on to Melvin Brown, Keller's father-in-law, who had earlier inquired of Iwan whether he knew anyone who would commit the murder. Brown then gave Iwan $2,000 in cash. Iwan passed the money on to Wiegers, who in turn gave it to Whitesell, who ultimately delivered it to defendant.

Iwan testified that Brown had told him that he, Brown, had gone out in Keller's place in response to defendant's call for a wrecker. Brown told Iwan that when he reached the scene of the allegedly disabled vehicle he had spoken to the person who had placed the call. The vehicle driven by that individual was a van carrying New York state license plates. Rick Demma testified that he had permitted defendant, whom he had met earlier that year, to borrow his van, which bore New York license plates, a number of times in 1981.

Although Demma had permitted some five other persons to use the van that year, he had never given Whitesell permission to use it. Defendant's former girlfriend corroborated the fact that defendant had used Demma's van on a number of occasions in the fall of 1981.

Keller's widow testified regarding an incident during which her husband had received a call to go out with the wrecker some two weeks before he was killed. Because Keller was busy at the time, the call was answered by Brown. She also testified regarding the call that Keller had received on the evening of October 22, 1981, which caused him to drive to the place where he was later killed.

Whitesell testified in defendant's case, as he had in Wiegers' case, that prior to the killing Waff had shown him a small pistol that resembled the pistol that Waff pawned at a Rapid City gun shop on November 6, 1981. Whitesell also testified that defendant had shown him a bullet, on the tip of which defendant had carved an "x" in order to make it explode upon impact and thus be untraceable. Defendant also told Whitesell about his first attempt to kill Keller, which failed when Brown responded to defendant's fake wrecker call in place of Keller. Whitesell also testified that on the day Keller's body was found defendant had told him that he had killed Keller by shooting him in the head and then dragging his body into the ditch. Whitesell then delivered the balance of the contract killing price to defendant at defendant's request.

The .25 caliber bullet that was removed from Keller's skull had had an "x" inscribed on its tip. The bullet was identified as having been fired from the pistol that Waff had pawned on November 6, 1981, as was the spent cartridge case found at the scene where Keller had been shot. Additionally, the State's evidence established that the firing pin on Waff's pistol had been altered, probably by filing, after firing the fatal shot.

Testifying in his own behalf, defendant acknowledged that he had been involved in selling drugs in Rapid City following the

completion of his enlistment in the air force. He acknowledged that Whitesell was one of his customers and that Whitesell had frequently come to his residence in 1981. Waff explained that he had purchased the .25 caliber pistol for self protection in May of 1981 after being robbed of some money and drugs. He testified that Whitesell had borrowed the pistol on one occasion in September of 1981. According to Waff's testimony, Whitesell had come to Waff's residence at approximately 11:30 on the morning of October 22, 1981, had asked to use Waff's telephone, and had borrowed the pistol, which he returned the following day. Telephone records indicate that a telephone call was made from Waff's phone at 11:54 a.m., October 22, 1981, to the telephone at Keller's place of business in Deadwood.

Waff denied having committed the murder, denied any knowledge of the murder, and denied having altered the firing pin on his pistol.

Defendant has raised some seven issues in his original and supplemental briefs.*

## I.

### REFUSAL OF TRIAL COURT TO INSTRUCT ON FIRST AND SECOND-DEGREE MANSLAUGHTER

■ The trial court refused to give defendant's proposed instructions that would have informed the jury that defendant could be found guilty of either first-degree manslaughter or second-degree manslaughter if the jury concluded that defendant was not guilty of the offenses charged in the indictment. We conclude that the trial court did not err in doing so.

SDCL 22–16–4 defines first-degree murder as follows:

Homicide is murder in the first degree when perpetrated without authority of law and with a premeditated design to

effect the death of the person killed or of any other human being, or when committed by a person engaged in the perpetration of, or attempt to perpetrate, any arson, rape, robbery, burglary, kidnapping, or unlawful throwing, placing, or discharging of a destructive device or explosive.

SDCL 22–16–15 defines first-degree manslaughter as follows:

Homicide is manslaughter in the first degree when perpetrated:

(1) Without a design to effect death by a person while engaged in the commission of a misdemeanor involving moral turpitude;

(2) Without a design to effect death, and in a heat of passion, but in a cruel and unusual manner;

(3) Without a design to effect death, but by means of a dangerous weapon;

(4) Unnecessarily, either while resisting an attempt by the person killed to commit a crime or after such attempt shall have failed.

Manslaughter in the first degree is a Class 1 felony.

SDCL 22–16–20 defines second-degree manslaughter as follows:

Any reckless killing of one human being by the act or procurement of another which, under the provisions of this chapter, is neither murder nor manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree. Manslaughter in the second degree is a Class 4 felony.

It is true, as defendant points out, that this court has consistently held that the crimes of first and second-degree manslaughter are lesser offenses included within the crime of murder and that the jury must be so instructed. *State v. Hubbard,* 20 S.D. 148, 104 N.W. 1120 (1905); *State v. Stumbaugh,* 28 S.D. 50, 132 N.W. 666 (1911); *State v. Godlasky,* 47 S.D. 36, 195

* Defendant's initial brief to this court was filed by the Northern Hills Public Defender's Office, which had been appointed to represent defendant on appeal. After present counsel was retained by defendant to continue with the appeal, following a disagreement between defendant and his original appellate counsel, we granted present counsel permission to file a supplemental brief.

N.W. 832 (1923); *State v. Painter,* 70 S.D. 277, 17 N.W.2d 12 (1944); *State v. Violett,* 79 S.D. 292, 111 N.W.2d 598 (1961); *State v. Zobel,* 81 S.D. 260, 134 N.W.2d 101 (1965); *State v. Grooms,* 85 S.D. 532, 186 N.W.2d 889 (1971); *State v. Lewis,* 90 S.D. 615, 244 N.W.2d 307 (1976); *State v. Vassar,* 279 N.W.2d 678 (S.D.1979). *See also State v. Lohnes,* 324 N.W.2d 409 (S.D. 1982).

With the exception of our decision in *Lohnes,* however, all of the foregoing decisions were rendered prior to our adopting and applying the two-part test for determining whether an offense is necessarily included within a greater offense as set forth in Justice Zastrow's special concurrence in *State v. Kafka,* 264 N.W.2d 702, 705 (S.D.1978). This two-part test consists of a legal test and a factual test.

The legal test contains three conditions: [F]irst, the elements of the included offense must be fewer in number than the elements of the greater charged offense. Second, the penalty for the included offense must be less than the greater charged offense in terms of the maximum punishment attached to each offense. Third, ... the two offenses must contain common elements so that the lesser included offense must be such that the greater offense cannot be committed without also committing the lesser.

264 N.W.2d at 705.

The factual test is as follows:

"Where a request has been made to charge the jury on a lesser-included offense, the duty of the trial judge is determined by the evidence. If evidence has been presented which would support a conviction of a lesser charge, refusal to give the requested instruction would be reversible error. (citations omitted) There must be sufficient evidence, however, when read in the light most favorable to the defendant, which would justify a jury in concluding that the greater offense was not committed and that a lesser offense was, in fact, committed."

264 N.W.2d at 706, *quoting People v. Karasek,* 63 Mich.App. 706, 234 N.W.2d 761 (1975).

The foregoing two-part test is now clearly the law in this state. *See, e.g., State v. Poss,* 298 N.W.2d 80 (S.D.1980); *State v. Oien,* 302 N.W.2d 807 (S.D.1981); *State v. Heumiller,* 317 N.W.2d 126 (S.D. 1982); *State v. Pickering,* 317 N.W.2d 926 (S.D.1982); *State v. Cook,* 319 N.W.2d 809 (S.D.1982); *State v. McNamara,* 325 N.W.2d 288 (S.D.1982); and *State v. Blakey,* 332 N.W.2d 729 (S.D.1983).

Without deciding whether either the offense of first-degree manslaughter or of second-degree manslaughter, as defined by SDCL 22–16–15 and SDCL 22–16–20, *supra,* satisfied the legal test, it is clear beyond peradventure that neither offense satisfied the factual test. As set forth in our statement of the facts in *Wiegers,* Keller had been shot in the head at very close range, stabbed some eight times in the chest and abdomen, dragged away from behind his vehicle, and then left for dead. Either the gunshot wound or the stab wounds could have caused death.

In sum, the evidence presented by the State could rationally have supported only a conviction of the offenses charged in the indictment. Defendant was either guilty of those two charges or he was guilty of nothing. Accordingly, the trial court did not err in refusing defendant's requested instructions on first and second-degree manslaughter. *State v. Blakey, supra; State v. Heumiller, supra; State v. Pickering, supra.*

To the extent that the decisions in *Hubbard, Stumbaugh, Godlasky, Painter, Violett, Zobel, Grooms, Lewis, Vassar, and Lohnes, supra,* are inconsistent with the views expressed herein, they are overruled.

Contrary to what is said in the dissenting opinion, we conclude that our holding on this point is neither foreclosed by nor contradictory to the dictates of SDCL 23A–26–7, which provides:

Whenever a crime is distinguished by degrees, a jury, if it convicts an accused,

shall find the degree of the crime of which he is guilty and include that finding in its verdict. When there is a reasonable ground of doubt as to which of two or more degrees an accused is guilty, he can be convicted of only the lowest degree.

This statute by its own terms applies only to crimes that are divided into degrees. Read correctly, *State v. Hubbard* merely holds that if an instruction is given on first-degree manslaughter the jury must also be given an instruction on second-degree manslaughter pursuant to the predecessor to SDCL 23A–26–7. "[W]henever a jury is instructed as to the crime of manslaughter a verdict therefore is permissible in either degree, and both degrees must be defined." 20 S.D. at 152, 104 N.W. at 1121.

■ It is true that *State v. Hubbard* makes the statement that manslaughter is included in the charge of murder, but in view of our holding today that statement is no longer invariably true. Accordingly, if in a given case, such as the one before us, the evidence does not admit of an instruction on first-degree manslaughter, the dictates of *Hubbard* and of SDCL 23A–26–7 are inapplicable.

■ As pointed out in the dissenting opinion, this court has adhered to *Hubbard* for some three-quarters of a century. A court should not abandon long-standing precedent merely for the sake of indulging in judicial avant-gardism, but neither should the pronouncements of an ancien régime be allowed to govern uninterrupted when they are revealed by the development of the law to no longer be in accord with sound reasoning.

## II.

### THE TRIAL COURT'S REFUSAL TO ADMIT POLYGRAPH EXAMINATION RESULTS

Whitesell was the State's principal witness against Waff. We noted the importance of his testimony to the State's case in our opinion in *Wiegers*. In exchange for his testimony against Waff and Wiegers, Whitesell entered into a plea bargain with the State, under the terms of which he agreed to enter a plea of guilty to a charge of first-degree manslaughter. Other pertinent terms of the agreement were as follows:

## III.

That the Court shall defer acceptance of the plea of guilty and the plea agreement until each of the following shall have occurred:

1. The Defendant shall cooperate fully with law enforcement officials regarding his knowledge pertaining to his involvement and the involvement of all other persons in regard to the murder of Russell Keller on or about the 22nd day of October, 1981. Said cooperation shall include, but not be limited to, his testimony at all proceedings relating to said killing.

2. The Defendant shall cooperate with Pennington County officials regarding all crimes committed in Pennington County of which the Defendant has knowledge provided that the Defendant shall be granted immunity by the Pennington County State's Attorneys Office for all non-violent crimes which the Defendant may have participated in.

## IV.

That upon entering a plea of guilty and the completion of the conditions set forth in paragraph III above, the State shall recommend to the Court, upon an adjudication of guilty and at the time of sentencing, that the Defendant receive a sentence of thirty (30) to forty (40) years imprisonment in the South Dakota State Penitentiary with credit being given for time already served. The Defendant shall be allowed to recommend to the Court any sentence which he and his attorney deem proper.

\*    \*    \*    \*    \*    \*

### VIII.

That the indictment filed against the Defendant alleging Murder in the First Degree and Conspiracy to Commit Murder shall be held in abeyance until such time as the conditions set forth in paragraph III above are completed and the Court accepts the Defendant's plea of guilty at which time the State agrees to dismiss said indictment and the charges contained therein with prejudice.

### IX.

That this plea agreement is contingent upon the Defendant not having been present at the actual, physical killing of Russell Keller on October 22, 1981. In the event that it is determined by the State that the Defendant was present at the killing of Russell Keller, this agreement shall be null and void and of no force and effect whatsoever.

The State filed a pretrial motion asking that the trial court enter an order prohibiting the introduction of or reference to polygraph examinations. In resistance to this motion, defendant's trial counsel filed a written offer to proof that David L. Bintliff, a Pennington County deputy sheriff, had administered a polygraph examination to Whitesell on May 13, 1983, at the request of the Lawrence County Sheriff's Department. According to the offer of proof, Bintliff would testify that he had asked Whitesell, during a series of three tests, the following questions regarding his possible involvement in Keller's death:

1. Did you cause those stab wounds to Russ Keller the night of his death?
2. Regarding Russ Keller's death, did you yourself cause any of those stab wounds to him?
3. Did you physically inflict any of the wounds that caused Russell Keller's death?
4. Were you there at the very moment Russ Keller was killed?
5. Regarding the death of Russ Keller, did you hear the gunshot that was fired at his head?
6. Did you make a phone call to Russ Keller the night of his death?
7. Did you fire the shot at Russ Keller's head the night of his death?
8. Regarding the gunshot wound to Russ Keller's head, did you yourself fire that shot?
9. Did you put an X on the bullet that was fired into Russ Keller's head?

Bintliff would testify that Whitesell answered "No" to all nine questions and that in Bintliff's opinion, Whitesell's answers to all but question 6 indicated clear deception on his part.

The trial court granted the State's motion and entered an order prohibiting the introduction of or reference to any polygraph examinations.

In our opinion in *Wiegers,* we discussed at some length the right granted a defendant by South Dakota Constitution Article VI, § 7, and our rules of evidence to impeach the prosecution's witnesses. Without repeating that discussion in detail, we reaffirm it and hold that it applies with equal force in the case before us.

■ There is no question but that Whitesell's testimony was crucial to the State's case against Waff. Accordingly, defendant was entitled to great latitude in cross-examining Whitesell and in introducing evidence that tended to impeach his testimony. As we indicated in our opinion in *Wiegers,* however, impeachment testimony and evidence must meet the general test of admissibility applicable to all proffered evidence.

Defendant points out that a number of courts have admitted the results of polygraph examinations under carefully limited conditions. *See, e.g., McMorris v. Israel,* 643 F.2d 458 (7th Cir.1981); *United States v. Estrada-Lucas,* 651 F.2d 1261 (9th Cir. 1980); *United States v. Oliver,* 525 F.2d 731 (8th Cir.1975); *United States v. Infelice,* 506 F.2d 1358 (7th Cir.1974); *United States v. Ridling,* 350 F.Supp. 90 (E.D. Mich.1972); *United States v. Hart,* 344 F.Supp. 522 (E.D.N.Y.1971); *Common-*

wealth v. A Juvenile, 365 Mass. 421, 313 N.E.2d 120 (1974); State v. McDonough, 350 A.2d 556 (Me.1976); State v. Christopher, 134 N.J.Super. 263, 339 A.2d 239 (1975); State v. Dorsey, 87 N.M. 323, 532 P.2d 912 (1975), aff'd, 88 N.M. 184, 539 P.2d 204 (1975); State v. Stanislawski, 62 Wis.2d 730, 216 N.W.2d 8 (1974); Cullin v. State, 565 P.2d 445 (Wyo.1977).

We note, however, that at least three courts that had earlier admitted polygraph examination results under certain conditions have abandoned that approach and now take the position that such results are inadmissible under any conditions. See Fulton v. State, 541 P.2d 871 (Okl.Cr.App. 1974) (overruling Castleberry v. State, 522 P.2d 257 (Okl.Cr.App.1974) and Jones v. State, 527 P.2d 169 (Okl.Cr.App.1974)); State v. Grier, 307 N.C. 628, 300 S.E.2d 351 (1983) (overruling State v. Steele, 27 N.C.App. 496, 219 S.E.2d 540 (1975); State v. Milano, 297 N.C. 485, 256 S.E.2d 154 (1979); and State v. Meadows, 306 N.C. 683, 295 S.E.2d 394 (1982)); State v. Dean, 103 Wis.2d 228, 307 N.W.2d 628 (1981) (overruling State v. Stanislawski, supra).

In United States v. Gordon, 688 F.2d 42 (8th Cir.1982), the Court of Appeals for the Eighth Circuit refused to reconsider its holding in United States v. Alexander, 526 F.2d 161 (8th Cir.1975), that polygraph results should not be admitted in the absence of a stipulation, the court noting that even if "polygraph techniques have dramatically improved in recent years, there is still no evidence that a 'lie detector' has any scientific reliability." Id. at 45. For an exhaustive review of the literature and case law regarding the reliability and the admissibility of polygraph examination results, see State v. Brown, 297 Or. 404, 687 P.2d 751 (1984). See also State v. Grier, supra, 300 S.E.2d at 358, n. 1; State v. Dean, supra; Saxe, Dougherty & Cross, "The Validity of Polygraph Testing," American Psychologist, March 1985, at 355.

■ In State v. Muetze, 368 N.W.2d 575 (S.D.1985), we recently reaffirmed our position that the results of polygraph examinations are not admissible in evidence in the courts of this state, adhering to our decisions in State v. Watson, 248 N.W.2d 398 (S.D.1976) and State v. O'Connor, 86 S.D. 294, 194 N.W.2d 246 (1972). Nothing in defendant's argument or in the authorities he has presented persuades us to change our position. Accordingly, we reaffirm the position that we took in Muetze, Watson, and O'Connor, and hold that the trial court did not err in refusing to permit defendant to introduce testimony regarding the results of the polygraph examination that had been administered to Whitesell.

In reaching our decision on this issue, we have not overlooked the fact that the polygraph examination was administered to Whitesell at the State's request. It was the fact that the government had requested that its principal witness be subjected to the polygraph examination that caused the trial court in United States v. Hart, supra, to rule that the results were admissible:

> The results of the tests which the government had Atkinson take are admissible on behalf of the defendant because the government initially thought they were reliable enough to assist it in evaluating its witness. This does not constitute any reason for changing the general rule and permitting a party to offer its own polygraph tests in evidence.

United States v. Hart, 344 F.Supp. at 524.

That was the same factual situation that we were faced with in Muetze, supra, and we clearly rejected the argument that we should follow the Hart holding.

■ Also, as was true in Muetze, defendant was aware of the results of the polygraph examination well before time of trial. Accordingly, there was no violation of his constitutional right to the disclosure of exculpatory information. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

### III.

### WHETHER THE PLEA BARGAIN AGREEMENT VIOLATED DEFENDANT'S DUE PROCESS RIGHTS

A copy of the plea bargain agreement between Whitesell and the State was intro-

duced by defendant, and defense counsel extensively cross-examined Whitesell with respect to the terms of the agreement.

Notwithstanding the fact that the jury was fully aware of the terms of the plea bargain agreement, defendant contends that his right to due process of law was violated, citing the decision by a three-judge panel in *United States v. Waterman,* 732 F.2d 1527 (8th Cir.1984). (District court's opinion affirmed by an equally divided court on reconsideration *en banc. Id.* at 1533.)

In *Waterman,* the government had entered into an agreement with a convicted defendant that if the defendant's cooperation in the form of truthful testimony led to further indictments, the government would affirmatively recommend that his sentence be reduced by two years and would also inform the appropriate federal agencies of the fact and extent of the defendant's cooperation. If the defendant's testimony did not lead to the indictment of other individuals, the government would acknowledge and inform the court of his cooperation but would not specifically recommend any reduction in his sentence. Reversing the district court's denial of the defendant's motion for relief under 28 U.S.C. § 2255, the panel decision held that it was not consistent with due process for the government to offer favorable treatment to a prosecution witness that was contingent upon the success of the prosecution, stating that "[s]uch an agreement is nothing more than an invitation to perjury having no place in our constitutional system of justice." 732 F.2d at 1531. Further, the panel held that the contingency agreement could not be legitimatized by making its existence known to the jury inasmuch as there is "no place in due process law for positioning the jury to weed out the seeds of untruth planted by the government." 732 F.2d at 1532. Concluding, the panel held:

> In sum, we are convinced that due process cannot be interpreted to allow the government to reward its witnesses based upon the results of their testimony. There simply is no reason to offer a witness favorable treatment for anything other than truthful cooperation in the government's quest for justice.

732 F.2d at 1533.

■ Aside from the fact that it was vacated on reconsideration *en banc,* as we read the panel decision in *Waterman* it was the contingent nature of the government's promise to recommend a two-year reduction in the witness' sentence that resulted in the holding that Waterman's due process rights had been violated. There is no such contingency in the plea bargain agreement that Whitesell and the State entered into. The State's reduction of the charge against Whitesell to first-degree manslaughter and its agreement to recommend no more than forty years' imprisonment were in no way contingent upon Waff's being indicted or convicted on the basis of Whitesell's testimony. Whitesell's only promise was to cooperate by testifying truthfully. The plea bargain agreement therefore did not constitute the encouragement and reward of bias or the planting of the seeds of untruth by the government. Accordingly, we hold that the plea bargain agreement did not result in a denial of defendant's right to due process of law. *See United States v. Dailey,* 759 F.2d 192 (1st Cir.1985).

We have carefully considered each of the remaining issues raised in defendant's initial and supplemental briefs and conclude that they present no issue of reversible error.

The judgment of conviction is affirmed.

MORGAN and HENDERSON, JJ., and WUEST, Acting Justice, concur.

FOSHEIM, C.J., dissents.

HENDERSON, Justice (concurring).

Two giant forces collide in law when stare decisis is eroded, ruptured, modified, overruled, or becomes obsolete.* A banner

---

* Stare decisis, contrary to some beliefs, is not always overcome in one prodigious swoop. In some instances, it is a gradual wearing away which is unperceptible to those who live and

of continuity with the past is unfurled. Against it, rises the demands of adaptability. It is Continuity versus Adaptability. Adaptability to the present and to the future. Can law, at the same time, in the same case, involving the same principle(s), have Continuity with the past and beget Adaptability to the present and the future—but still renounce past precedent? It is a legal tightwire to trod upon. It is good to keep in mind the old, but it is good to adapt to the new.

The law must be adaptable to the facts at hand so that the decision makes sense. A decision must reach out and fairly touch the parties involved in the litigation, not just history. Precedent addresses the past; often, it is full of wisdom and cannot be fully, nor partially, disregarded. Existing precedent is often the relevant rule of law. When it is defensible, and applicable, it should live on.

Those of us who are weighted with the decision-making process must realize, however, that the law must address the needs of the present. In South Dakota, I have lived in an age where the farmers drove the team to town to get groceries and a load of coal, to watching, through television, America placing a man on the moon via a rocket and spaceship. Now, the advent of a new defense stratagem for our country called "Star Wars" mystifies us. Law must change with the times. It cannot be 100% Continuitous. It must be Adaptable. It must serve the needs of society. We cannot always cherish a doctrine or principle hoary with age. Innovations in society, technological advances beyond our wildest imagination, and revolutionary economic change and expansion require adaptability in the ever-development and growth of the law.

We should not treasure stare decisis more than we seek justice in any given case; and we should not marry ourselves to historical doctrine, out of a sense of judicial obligation. Rather, we should

work with the original principle. Note comment on erosion of *Houghton* rule in *State v.*

hitch our wagon to that which appeals to reason. If it means to chart a new course on the compass for a court, so let it be. The United States Supreme Court reversed itself 133 times as of June 26, 1969. Friedman & Israel, The Justices of the United States Supreme Court, 1789—1969, Volume 4, 3258–3265 (1969). Mr. Justice Field, in *Barden v. N. Pac. R.R. Co.*, 154 U.S. 288, 322, 14 S.Ct. 1030, 1036, 38 L.Ed. 992, 1000 (1894), expressed: "It is more important that the court should be right upon later and more elaborate consideration of the cases than consistent with previous declarations."

In departing from past precedent, the strong facts of a case can change, if not command, an individual judge's reaction to stare decisis. This legal phrase has been bantered about by various textbook writers and legal authors. Sometimes it is referred to as a custom. Sometimes a doctrine. It has often been referred to as a maxim, principle, or rule. Others have described it as a technique, theory, or policy. It all boils down to a belief that decided cases in the past should be followed, which have pronounced a definable rule(s) of law, in deciding identical or similar cases involving a similar or identical question of law. Perhaps I am influenced by the strong facts in this scenario. As I perceive it, the pressure of the facts simply militate against a jury instruction on manslaughter and a jury verdict of manslaughter. In the companion case of *State v. Wiegers*, 373 N.W.2d 1, 17 (S.D.1985), I took the position that a conviction of second-degree manslaughter should be reversed as there was nothing reckless at all in the killing. It was a cold-blooded killing for hire. I take the same position on second-degree manslaughter in this case; again, we are confronted with the same set of facts and there could not be, on the part of Waff, a reckless killing. Examining the first-degree manslaughter statute in this state, SDCL 22–16–15, Waff:

*Willis,* 370 N.W.2d 193, 198 (S.D.1985).

(1) Did not effect the death of Keller while engaged in the commission of a misdemeanor involving moral turpitude;

(2) Did not kill in the heat of passion;

(3) Did not effect death, without a design to effect death, but by means of a dangerous weapon (the murder was plotted over a period of months and designed to effect death by a bullet behind the ear);

(4) Did not kill unnecessarily, while resisting an attempt by the person killed to commit a crime or after such attempt shall have failed.

Therefore, a first-degree manslaughter instruction does not square with the facts. It does not appeal to reason. This decision must serve the needs of society and it must serve the present and not the past. Our decision must fairly touch the interests of the parties, not just a history of old cases in this Court.

*State v. Vierck,* 23 S.D. 166, 120 N.W. 1098 (1909), *State v. Horn,* 21 S.D. 237, 111 N.W. 552 (1907), *State v. Kapelino,* 20 S.D. 591, 108 N.W. 335 (1906), and *State v. Hubbard,* 20 S.D. 148, 104 N.W. 1120 (1905), were decided shortly after the turn of the century. At that time, South Dakota had no degrees of murder. The precedent of those decisions were observed through 1979 in *State v. Vassar,* 279 N.W.2d 678 (S.D.1979). This is rather remarkable for the life of a rule of law is ordinarily quite short, particularly when measured against the entire corpus and life of the law. In 1980, however, our statutes were amended to provide degrees of murder. Needless to say, this was a significant change in the homicide statutes of this state. Instructions in the degrees of murder are therefore viable, sound, and in keeping with the state statutes. Instructions in the degrees of manslaughter are likewise appropriate. As to both of these separate crimes, divided into degrees, the trial court can and should only instruct the jury on matters supported by the evidence. *See State v. Fender,* 358 N.W.2d 248 (S.D. 1984); *Miller v. State,* 338 N.W.2d 673

(S.D.1983); *State v. Chamley,* 310 N.W.2d 153 (S.D.1981); *State v. Oien,* 302 N.W.2d 807 (S.D.1981); *State v. Curtis,* 298 N.W.2d 807 (S.D.1980); *State v. Wilson,* 297 N.W.2d 477 (S.D.1980); *State v. Bean,* 265 N.W.2d 886 (S.D.1978); and *State v. Kafka,* 264 N.W.2d 702 (S.D.1978). These cases are an erosion to the *Hubbard* decision and its progeny.

As Justice Wollman has pointed out, the two-part test is now the settled law of this state. This constitutes erosion of stare decisis. Surely, the 1980 statute has been a force in the obsolescence of the stare decisis of the *Hubbard* homicide rule. Continuity must yield to Adaptability due to these factors. Accordingly, I do not specially concur nor concur in the result, but, rather, fully concur in the majority opinion.

FOSHEIM, Chief Justice (dissenting).

Under the settled law of this State, the trial court should have given the defendant's proposed instruction that the jury could find him guilty of either first degree manslaughter or second degree manslaughter if they concluded he was not guilty of the offense of murder in the first degree as charged.

It is clear from a long line of decisions starting with *State v. Hubbard,* 20 S.D. 148, 104 N.W. 1120 (S.D.1905), to *State v. Lohnes,* 324 N.W.2d 409 (S.D.1982), *cert. denied,* 459 U.S. 1226 (1983), that murder and manslaughter and any subdivision of either are by statute degrees of criminal homicide. They constitute what SDCL § 23A–26–7 refers to as a crime distinguished by degrees and concerns which degree of a crime the jury must find if it convicts. It follows that the trial court must instruct the jury accordingly. *State v. Stumbaugh,* 28 S.D. 50, 132 N.W. 666 (1911). It is reversible error when the trial court refuses to charge the jury on all degrees of criminal homicide lesser than the degree of criminal homicide with which the defendant is charged. *State v. Horn,* 21 S.D. 237, 239, 111 N.W. 552, 552 (1907) (citing *Hubbard, supra.*) *See also State v. Painter,* 70 S.D. 277, 17 N.W.2d 12 (1944).

The desire of the majority to obtain a uniform rule for application of lesser included offenses is laudable. However, some of the comments in the majority opinion cause me to wonder if we are reading the same statutes. The majority opinion interpretation that the requirements of SDCL § 23A–26–7 apply only to the degrees of murder, if Murder I is charged, or the degrees of manslaughter, if Manslaughter I is charged, does not agree with what the statute expressly states. That SDCL § 23A–26–7 applies to all degrees of criminal homicide is clearly indicated by the statutory scheme for homicide.

First, the *"degrees of homicide"* are defined: murder, manslaughter, excusable homicide, or justifiable homicide. SDCL § 22–16–1 (1979) (origin in Penal Code of 1877). Subsequent statutes define and further divide those degrees. *See* SDCL ch. 22–16. Second, all subsequent statutes throughout that chapter consistently use the terms *"degree of homicide,"* SDCL § 22–16–3, and "homicide is...." SDCL §§ 22–16–4, –6, –7, –8, –9, –15, –30, –31, –34, –35 (emphasis supplied). This scheme was continued in 1980 when murder was subdivided into two degrees. SDCL §§ 22–16–4, –7, –9. Therefore, the degrees or divisions of criminal homicide include two degrees of murder and two degrees of manslaughter. To conclude that SDCL § 23A–26–7 applies only to the degrees of murder or only to the degrees of manslaughter overlooks these obvious expressions of legislative intent. The definition of homicide does include excusable and justifiable homicide, but these are not crimes. Since they are not an offense, they cannot be an included offense. They have no place in a charge of criminal homicide and are not involved in the instructions unless raised as a defense.

Other jurisdictions agree with our historical conclusion that degrees of homicide include both murder and manslaughter. *See, e.g., State v. Gregory,* 218 Kan. 180,

542 P.2d 1051 (1975) and *Chisley v. State,* 202 Md. 87, 95 A.2d 577 (1953). Florida, with a statute similar to SDCL § 23A–26–7,[1] has consistently held that the jury must be instructed on all degrees of murder from the degree charged and below, as well as manslaughter. *Rodriguez v. State,* 443 So.2d 286 (Fla. 3rd Dist.Ct.App.1983) (citing, *inter alia, Lewis v. State* 377 So.2d 640 (Fla.1979) and *Martin v. State,* 342 So.2d 501 (Fla.1977)). In homicide cases, the trial judge "appropriately instruct[s] the jury as to all degrees of murder, manslaughter, justifiable homicide, and excusable homicide, all having to do with *the death of the victim." Sadler v. State,* 222 So.2d 797, 799 (Fla.2d Dist.Ct.App.1969) (emphasis original). The rationale behind their statute, like ours, was clearly recognized. When a trial judge unilaterally determines that there is no evidence to instruct the jury on a lesser offense, he "takes a most critical evidentiary matter from the proper province of the jury and vests it improperly as a matter of law with the trial judge." *Hand v. State,* 199 So.2d 100, 102 (Fla.1967).

The South Dakota Legislature has followed the same rationale and has given the jury the duty to determine which degree of a crime, if any, the defendant has committed:

[T]he mandate of [SDCL § 23A–26–7] is that the jury must find the degree, and the court must instruct as to all matters of law essential to an intelligent consideration of the facts as they may reasonably appear to the respective members of the jury, they might have been misled to the prejudice of the accused by refusing to give the requested instruction. Under our statute it is indispensable to the proper trial of a homicide case that the degree of the crime be ascertained and designated by the jury. ... The crime of manslaughter is necessarily included in that of murder, and in all cases where a party is put upon his trial for murder in

---

**1.** Fla.R.Crim.P. Rule 3.490 (1975). Their statute was amended in 1981 to include a factor which considers the evidence presented before an in-struction is required. *See* Fla.R.Crim.P. Rule 3.490 (Supp.1985).

the first degree *all the degrees of criminal homicide* should be explained and submitted to the jury.

*Hubbard* at 150–51, 104 N.W. at 1121 (quoting in latter *State v. Clemons,* 51 Iowa 274, 1 N.W. 546, 550 (1879)) (emphasis supplied). The statute is clear. Our interpretation of it has been consistent. To now hold otherwise is to circumvent legislative intent.

I would reverse.