**STATE of South Dakota, Plaintiff
and Appellee,**

v.

**Jeffrey A. BENNIS, Defendant
and Appellant.**

No. 16681.

Supreme Court of South Dakota.

Argued March 19, 1990.

Decided June 13, 1990.

Thomas H. Harmon, Deputy Atty. Gen., Pierre, for plaintiff and appellee; Roger A. Tellinghuisen, Atty. Gen., Pierre, on brief.

Patrick M. Schroeder, Drake A. Titze, Minnehaha County Public Defender, Sioux Falls, for defendant and appellant.

HENDERSON, Justice.

## PROCEDURAL HISTORY/ISSUES

Jeffrey A. Bennis (Bennis) was charged with two counts by the Minnehaha County grand jury. Count I charged Murder in the First Degree and Count II charged Manslaughter in the First Degree.

A jury trial was held on March 29 through April 7, 1989, and a verdict of guilty on the charge of First Degree Murder was returned. On April 17, 1989, Bennis was sentenced to life in prison without parole.

On appeal Bennis alleges:

(1) That the trial court erred in precluding Bennis from presenting an "intervening cause" defense;

(2) That the trial court erred in admitting into evidence autopsy photographs of the decedent;

(3) That the trial court erred in denying Bennis' request for a jury instruction on the lesser-included offense of manslaughter in the second degree;

(4) That the trial court erred in denying Bennis' motion for mistrial based upon cumulative rulings of the court; and

(5) That the jury verdict finding Bennis guilty of Murder in the First Degree was "clearly erroneous" and not supported by the evidence.

—Holding—

Rejecting Bennis' arguments, we affirm this First Degree Murder conviction.

## FACTS

On Friday night, November 18, 1988, Bennis contacted the Playmate Escort Service of Sioux Falls, requesting the company of a slender brunette. The Service put him in contact with Kari Loosbrock (Loosbrock), who agreed to meet Bennis at his apartment. An arrangement was made between the Service and Loosbrock to the effect that a telephone check would be made after she arrived at the apartment.

At Bennis' apartment, Loosbrock agreed to have sex with Bennis at the rate of $80 for 30 minutes. When the one-half hour was over, Bennis wished to continue but Loosbrock demanded more money. Bennis was upset by that request.

According to Bennis, he left his bedroom and went to the apartment's kitchen where he grabbed a butcher knife, intending to return to the bedroom in order to scare Loosbrock. Bennis returned to the bedroom, holding the knife in front of Loosbrock. She was subsequently stabbed in the chest.

At that point, the Playmate Escort Service called Bennis' apartment inquiring about Loosbrock. When Bennis answered the phone, the Playmate Escort Service manager, Rita Uti (Uti) heard Loosbrock in the background saying, "No, I am not alright." Bennis testified that he took Loosbrock into the bathroom to shower Loosbrock's blood off both of them. As Loosbrock laid down in the tub, Bennis began removing bloody mattresses, blankets and clothes from the apartment. More than one trip was made while Loosbrock lay unconscious, bleeding to death, in the bathtub.

At this point, Uti arrived at the apartment. She saw Bennis carrying a bundle out of the back door to the dumpster. Bennis told Uti that Loosbrock was in the bathroom. Uti looked into the bathroom and saw the victim laying in the bathtub, which was full of blood. Uti noticed spatters of blood on Bennis that were later identified as Loosbrock's blood.

Uti called 911 and the police soon arrived on the scene. The officers attempted to

render emergency first aid assistance to the victim.

At 1:04 a.m., the Sioux Falls ambulance arrived at Bennis' apartment and remained there for approximately 40 minutes. Upon arrival, the paramedics noticed a great amount of blood. However, the victim was no longer bleeding from the wound. The victim was not breathing and did not have a pulse. The paramedics administered cardiopulmonary resuscitation (CPR). They also attempted to revive the victim by administering the stimulant drug epinnephrine and giving intravenous lactated ringers solution. After their efforts to stabilize the victim, the paramedics transported Loosbrock to the hospital.

At the hospital, Loosbrock was taken to the operating room and Dr. Fredrick L. Harris, a surgeon, made attempts to save her life. Dr. Harris testified concerning the subclavian vessel, which was cut when Bennis stabbed the victim. He stated: "The bleedout rate from that would be dramatic. So in a period of a minute or two you would have lost enough blood to put the patient in shock."

Dr. Brad Randall, the Minnehaha County Coroner, testified that the victim, Kari Loosbrock, died as a result of a stab wound to the right chest.

After Bennis was arrested, he was overheard telling another inmate in the Minnehaha County jail that "She took it [his money] away and that's when I kind of got, pissed off and I lost it...."

Bennis was arrested, tried, convicted, and is presently an inmate in the South Dakota State Penitentiary.

## DECISION

I. *The trial court did not err in rejecting Bennis' intervening cause defense.*

Bennis argues to this Court that the trial court erred in rejecting his request to be allowed to present a defense based upon the alleged existence of an intervening cause being the actual cause of victim Loosbrock's death. The trial court noted, and Bennis admits, that the so-called interven-ing cause defense has never been recognized in South Dakota.

■ Since the intervening cause defense has never been recognized by this Court and this being a case of first impression, we reply to Bennis' argument in general by adopting the language of Vice Chief Justice Struckmeyer speaking for the Supreme Court of Arizona in *State v. Sauter,* 120 Ariz. 222, 585 P.2d 242 (1978). In *Sauter,* the Arizona Supreme Court held that the trial court properly excluded evidence of intervening medical malpractice where a defendant, while intoxicated and in the course of an altercation, stabbed a victim who, despite surgery, subsequently died from blood loss. The Arizona court held that evidence establishing the wounded victim might have recovered, if the wound had been more skillfully treated, was no defense to a charge of murder. *Sauter* further states that medical malpractice will break the chain of causation and become the proximate cause of death *only if it constitutes the sole cause of death.* We think this case correctly summarizes the law relative to intervening acts arising out of medical treatment in the United States. *See* 100 A.L.R.2d 769, anno. "Homicide; liability where death immediately results from treatment or mistreatment of injury inflicted by the defendant." *See also People v. Stamps,* 8 Ill.App.3d 896, 291 N.E.2d 274, 279 (1972); *People v. Stewart,* 40 N.Y.2d 692, 389 N.Y.S.2d 804, 807, 358 N.E.2d 487, 491 (1976); *State v. Cox,* 82 Idaho 150, 351 P.2d 472, 475 (1960); *State v. Richardson,* 197 Wash. 157, 84 P.2d 699, 782 (1938).

■ In the present case, the alleged medical mistreatment did not break the chain of causation. In homicide cases, the state bears the burden of proving beyond a reasonable doubt that the victim's death resulted proximately from the defendants act or omission. *In Re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The trial court found that "there has been no admission by any witness that there was any type of grossly negligent treatment on the part of the paramedics or anyone else and that Bennis' act of stabbing Loosbrock

was the sole cause of her death." The Minnehaha County Coroner, Dr. Brad Randall, testified that the cause of Loosbrock's death was a stab wound to the right chest. It should also be noted that Bennis did *nothing* to help the victim. As the trial court's finding on the record is supported by the evidence (lack thereof to establish intervening cause), it was not error. to refuse a requested instruction on intervening cause. It was not error to deny Bennis' request for a continuance to allow expert testimony on this theory, nor was it improper to deny Bennis' argument on this point to the jury. The State proved beyond a reasonable doubt that the stabbing, not the medical treatment, was the proximate cause of Loosbrock's death. Further, the jury's determination that Bennis was responsible for the death of Loosbrock was legally permissible and sufficiently justified by credible evidence so as to support their finding of guilt beyond a reasonable doubt.

## II. *The trial court properly admitted autopsy photographs of the victim.*

Defense counsel argues that the trial court erred because it admitted the photographs identified as Exhibits 6 and 63 in the Settled Record on a basis not urged by the State. In reviewing evidentiary matters on appeal, we are concerned with the reasoning of the trial court for admitting the evidence rather than the proponent's reasoning. It is cardinal to determine if the trial court is right or wrong.

In making evidentiary rulings, the trial court has broad discretion. Bennis must show an abuse of discretion to reverse the trial court's ruling. *State v. Kaseman*, 273 N.W.2d 716 (S.D.1978). Here, the court admitted the photos relying on *State v. Novaock*, 414 N.W.2d 299 (S.D. 1987) *citing State v. Holland* 346 N.W.2d 302, 307 (S.D.1984). *Novaock* held that certain photographs, although grotesque and cumulative, were not improper because they were necessary to aid the expert's presentation of evidence. Regardless of what reason the State sought to introduce the photographs, the fact remains that an expert testified that the photographs would aid him in testifying concerning that which was done in an attempt to save the victim's life and to show the location of the stab wound on the body. We are convinced that the trial court did not abuse its discretion in admitting the photographs into evidence. *Kaseman, supra.*

## III. *The trial court did not err in refusing to instruct the jury upon the lesser included offense of manslaughter in the second degree.*

The jury was instructed as to first degree manslaughter and first degree murder. Bennis' counsel requested an instruction on second degree manslaughter. The trial judge refused the instruction on the ground that there was insufficient evidence for the jury to conclude that if Bennis stabbed the victim it could have been second degree manslaughter. *State v. Gregg*, 405 N.W.2d 49 (S.D.1987).

The law on this point is settled. If the evidence does not admit or support an instruction on a lesser degree of homicide, the trial court need not give it. *State v. Waff*, 373 N.W.2d 18 (S.D.1985). In order to make this determination, the trial court is required to analyze the situation through both a legal and factual test. *Waff, id.*. The essence of the factual test is that there must be sufficient evidence, when read in the light most favorable to the defendant, which would justify the jury in concluding that the greater offense was not committed and that a lesser offense was, in fact, committed. *State v. Oien*, 302 N.W.2d 807, 809 (S.D.1981). Since it is clear that the factual test has not been satisfied in the present case, we do not address the elements of the legal test.

Bennis suggests another possible version of the stabbing which supposedly would have allowed a finding of second degree manslaughter: "The wound may have been inflicted by accident, and during mutual combat." There is no evidence from which the jury could have found that the injury and subsequent death were the result of an "accident" or reckless behavior. This was not a situation of people

calmly discussing a problem and casually examining a weapon. Because of the violent situation triggered by Bennis bringing out the knife (murder weapon) from the kitchen (without any provocation whatsoever by the victim), the factual scenario did not constitute Manslaughter in the Second Degree. He stabbed victim—who had no weapon—so there was no "mutual combat". His act was singular, deadly and unprovoked. The trial court properly denied Bennis' request for a Second Degree Manslaughter instruction because such a finding simply was not supported by the evidence. *Waff, supra.*

## IV. *The trial court did not err in denying Bennis' motion for mistrial.*

■ Bennis, via Motion for Mistrial, contends the trial court erroneously admitted the autopsy photographs, erred in denying his motion for a one-day continuance, and erred in denying his proposed jury instructions. Bennis believes the cumulative effect of the court's rulings denied him a fair and impartial jury trial.

Very recently this Court had occasion to examine the issue of the cumulative effect of alleged errors denying a defendant a right to a fair trial. In *McDowell v. Solem,* 447 N.W.2d 646 (S.D.1989) this Court addressed each of the individual allegations of prejudicial error committed during the trial.

> We have given due consideration to each of the arguments set forth by McDowell in this appeal, and we believe that even when considered in a cumulative manner, the allegations do not support a finding that McDowell was denied his constitutional right to a fair trial. Again, we must reiterate, it is not required that Defendant receive a perfect trial, only that he receive a fair trial. *Brown v. United States,* 411 U.S. 223, 231–32 [93 S.Ct. 1565, 1570–71, 36 L.Ed.2d 208] (1973).

The fact that Bennis' counsel was precluded from making a groundless defense, did not deny him a fair trial. Also, the autopsy pictures were not inflammatory nor were they cumulative. Bennis most

assuredly received a fair trial. *McDowell, id.*

## V. *The jury verdict finding Bennis guilty of murder in the first degree is fully supported by the record.*

In determining the sufficiency of the evidence on appeal in a criminal case, the issue before this Court is whether there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilty beyond a reasonable doubt. In making such a determination, this Court will accept that evidence and the most reasonable inferences that can be fairly drawn therefrom, which will support the verdict.

*State v. Dale,* 379 N.W.2d 811, 814 (S.D. 1985). The record in this case clearly meets that requirement.

■ Victim went to Bennis' apartment. She spoke to her Escort Service twice and eventually informed them that she was not alright. She was found lying in a pool of blood in Bennis' bathtub. He lied several times regarding her presence in his bathtub. Her blood was found all over his apartment and also on Bennis' body. A butcher knife from his apartment was the murder weapon. Bennis bragged to his jailmate that he would not put up with the victim trying to take all of his money. Shortly after the arrest, he admitted to his jailmate that he had lost control. Even without Bennis' testimony, there was sufficient evidence from which the jury could conclude that Bennis had, in fact, caused the death of Kari Loosbrock.

Bennis' own testimony established a plateau of proof to certainty beyond a reasonable doubt. Bennis was upset because he was told by the victim that he would have to give her more money if he intended to continue having sex with her. He went into the kitchen where he thought about what he would do for three or four minutes. He took a butcher knife and returned to the bedroom. She was naked and defenseless. He displayed the knife to the victim ostensibly to frighten her. He testified that they grappled and that he heard a "pop" when the knife entered her

chest. Blood spurted upon her, Bennis and even the walls. He made no attempt whatsoever to assist her but did make heroic efforts to cover up his crime. Therefore, we hold that the evidence in this record is more than sufficient to sustain a finding of guilt beyond a reasonable doubt. In making such a determination, this Court will accept that evidence and the most reasonable inferences that can be fairly drawn therefrom, which will support the verdict. *State v. Davis*, 401 N.W.2d 721 (S.D.1987).

Affirmed.

WUEST, C.J., and MORGAN and MILLER, JJ., concur.

SABERS, J., concurs in result.

SABERS, Justice (concurring in result).

### 1. *Intervening cause defense.*

I believe the majority's statement of the law regarding an intervening cause defense is incomplete and too restrictive.

The majority's statement of the law is incomplete because it does not explain that its analysis is applicable only to dangerous wounds designed to destroy life. The *Sauter* opinion, upon which the majority relies, specifically addresses situations where the wound inflicted upon the victim was "calculated to endanger his life." *State v. Sauter*, 120 Ariz. 222, 223, 585 P.2d 242, 243 (1978). We should make it clear that non-life-threatening wounds are not within the scope of the decision.

The majority's decision is too restrictive because it allows an intervening cause defense on the basis of medical malpractice *"only if [the malpractice] constitutes the sole cause of death."* (Emphasis in original). Such a standard will likely prevent a defendant from ever being allowed to raise an intervening cause defense. If medical malpractice is the *sole* cause of death it is unlikely the defendant would even be charged with murder. On the other hand, a "sole cause of death" standard would deny the defense in situations where it is justified. For example, consider a situation where grossly negligent medical care allows a person to bleed to death from a stab wound that would not be fatal with proper treatment. How could the medical treatment be deemed the "sole cause of death" when the person died because of a stab wound? Yet, death would not have occurred but for the gross negligence.

The Colorado Supreme Court has recognized that a "sole cause of death" standard is inadequate and has adopted a "but for" test. *People v. Calvaresi*, 188 Colo. 277, 534 P.2d 316 (1975). The *Calvaresi* court rejected a jury instruction that would not allow medical malpractice as a defense to a homicide charge unless "death results solely from erroneous treatment by another." *Id.*, 188 Colo. at 282, 534 P.2d at 319. The court concluded that the instruction was "not a sufficiently complete statement of the law," because a conviction for homicide requires that the death be the natural and probable result of an unlawful act and not the result of an unforeseeable intervening cause in which the accused did not participate. *Id.* Instead, the court held that grossly negligent medical treatment "would constitute a defense, if, but for that gross negligence, death would not have resulted." *Id.; cf. People v. Clark*, 171 Mich.App. 656, 431 N.W.2d 88 (1988) (If it appears that, but for the act of another, death would not have occurred, such supervening cause is a good defense to the charge of homicide).

The reason the "but for" rather than the "sole cause of death" standard should be adopted is evident upon consideration of our treatment of attempted crimes. The legislature has decreed that someone who attempts to commit a crime shall be punished less severely than someone who succeeds in committing the crime. *See* SDCL 22-4-1. Yet, under a "sole cause of death" standard, identical attempted homicides could be punished differently depending upon actions outside the control of the defendant. Consider a situation in which two assailants inflict identical stab wounds on two victims—the first victim receives normal medical treatment and lives, the second victim receives grossly negligent treatment and bleeds to death. The criminal responsibility of the two assailants should be the same because they committed the same

wrongful act. Yet under the majority's decision, the first assailant could be convicted only for attempted murder while the second assailant, denied an intervening cause defense, would be convicted for murder. The assailants should not be punished differently simply because of the gross negligence of medical personnel. Allowing the second assailant to raise the grossly negligent * medical treatment as an intervening cause defense would correct the disparity.

Under the facts of this case, Bennis would not have been entitled to present an intervening cause defense even if a "but for" standard were used. Bennis offered no evidence of improper medical treatment that would rise to the level of gross negligence. At best, the evidence suggested that *different* treatment *may* have prevented the death. The evidence simply did not allow an intervening cause defense.

### 2. *Autopsy photographs.*

I also object to the manner in which the autopsy photographs were admitted into evidence. The majority concludes the trial court did not abuse its discretion in admitting the photographs because "an expert testified that the photographs would aid him in testifying." Whether to admit a photograph should not depend simply on whether it will aid an expert's testimony. Additional factors must be considered.

The photographs in this case are of a different nature than those in *State v. Novaock,* 414 N.W.2d 299 (S.D.1987), and *State v. Ashker,* 412 N.W.2d 97 (S.D.1987), because the photographs in those cases were *necessary* to show the wound entries, the blood-spatter pattern, and that two assailants were required to effect the wounds. Why were the photographs needed here? The State's expert testified in chambers that he could also use a chart or his own person to aid his testimony. In other words, the photographs were not necessary, merely useful. However, inflammatory photographs are not to be admitted

unless they are "necessary to aid [an] expert's presentation." *Novaock, supra* at 302. The autopsy photographs were inflammatory because they showed extensive surgical wounds in addition to the stab wound. Therefore, since the photographs were not necessary for the expert's testimony, their inflammatory nature required that they not be admitted into evidence.

The trial court's error was nevertheless harmless. Although the autopsy photographs were inflammatory, they were only marginally so, unlikely to arouse the jury's passion in any significant manner. In contrast, the other evidence supporting the verdict was extensive. As a result, it is clear "beyond a reasonable doubt that the error was harmless and did not contribute to the verdict obtained." *State v. Michalek,* 407 N.W.2d 815, 819 (S.D.1987).

---

* Mere negligence would be insufficient to justify an intervening cause defense because negligence, while not common, is foreseeable and falls within the realm of "normal" treatment. *See Calvaresi, supra,* 188 Colo. at 282, 534 P.2d

at 319. In addition, it could be difficult to determine whether a death would not have resulted but for the medical treatment if the treatment is merely negligent.