THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v PASQUALE ZAPPINO, Respondent.

Second Department, June 23, 1986

## APPEARANCES OF COUNSEL

*John J. Santucci, District Attorney (Thelma Lee* and *Andrew Zwerling* of counsel), for appellant.

*Philip L. Weinstein, Philip A. Russotti* and *William E. Hellerstein (Deborah L. Cohen* of counsel), for respondent.

## OPINION OF THE COURT

Mangano, J. P.

The main question raised on the instant appeal by the People of the State of New York is whether Criminal Term was correct in dismissing the indictment on the ground that the People had failed to disprove the defense of justification.

In our view, that question must be answered in the affirmative.

The defendant's indictment on the charge of murder in the second degree arose out of the fatal shooting of one Melvin See by the defendant, in the defendant's pizzeria, on November 18, 1980.

At the conclusion of the People's case, the defense counsel moved, *inter alia,* to dismiss the murder count of the indictment on the ground that the People had failed to disprove the defendant's justification defense beyond a reasonable doubt. The motion was denied at that point.

At the conclusion of the defense case, counsel moved for a "trial order of dismissal" on the ground that there was "insufficient evidence to give to this jury to find this defendant guilty beyond a reasonable doubt". The court reserved decision on the motion.

The court then charged the jury on the elements of murder in the second degree, the lesser included offense of manslaughter in the first degree and the defense of justification. The jury reached a verdict of not guilty on the charge of murder in the second degree, but was deadlocked on the lesser included charge of manslaughter in the first degree. Defense counsel then moved for a mistrial, and after the People advised the court that they did not object to that application, the jury was discharged.

On September 23, 1981, defense counsel sought to "renew"

his earlier motion to dismiss based upon a failure of the People to adduce proof of guilt beyond a reasonable doubt. Criminal Term granted the motion which it had previously reserved decision on, holding that the People "miserably [had failed] to disprove the defense of justification".

It is from the order entered on this determination that the People appeal.

At the trial, it was the People's theory, adduced primarily through the eyewitness testimony of the decedent's paramour, that the defendant, while standing behind his pizzeria counter, leaned over and shot the decedent as the latter was crouched on the other side of the counter with his back against it, holding a small green garbage can over his head with his hands.

In contrast, it was the defense theory at the trial, as developed through the defendant's statement to the police, as well as his wife's testimony, that the decedent, upon entering the pizzeria, attempted to hit the defendant's wife and child with a stick. Thereupon, the decedent threw a green garbage can over the counter at the defendant, jumped on the counter knocking over a container of pizza sauce, threw the stick at the defendant and then threatened to kill both the defendant and his family. After getting off the counter, the decedent placed his hand under his sweater, as if he were reaching for a gun, and yelled that he was going to kill the defendant and his wife. It was in response to this behavior on the decedent's part that the defendant fired one shot from a shotgun at the decedent.

Both sides submitted expert medical testimony, which, together with the aforenoted lay testimony, indicated at first blush that it would be for the jury to resolve the issue of justification. However, a careful examination of the expert testimony, as well as the physical evidence, clearly supports the characterization by Criminal Term of the testimony of decedent's paramour as "incredible".

The defendant's medical expert, the former Chief Medical Examiner of the City of New York, unequivocally testified, based on the evidence adduced, that the decedent's wounds "could not" possibly have been caused by the set of circumstances described by the decedent's paramour. Specifically, the defendant's medical expert unequivocally testified that (1) a shotgun pellet entering the decedent's hand at the angle described by the decedent's paramour would have come out

and could not have resulted in the grazing wound with substantial internal injury that the decedent in fact sustained and (2) the shotgun pellets which entered the decedent's body all entered in the front and side, which meant that the decedent could not have been shot from behind. The defendant's medical expert also testified as follows in response to questioning:

"Q Okay now was there any other position that the deceased could have been in in terms of this hand for him to sustain the injuries that you saw reported in Dr. Fernando's report?

"A The hand has to be more or less in the direct line as I showed you because they have to ricochet off to spread.

"Q And so your testimony is there no other position other than—they had to be almost facing each other with the hand up?

"That's right."

Of even greater significance is the fact that the testimony of the People's medical expert, given on direct examination, agreed with that of his defense counterpart, to the effect that the decedent's wounds would be consistent with shots from a weapon "[p]ointed directly to the victim", "[p]ointing at him" and not pointed "directly downward". On cross-examination, the People's medical expert amplified his direct testimony, when he responded as follows to queries from the defense counsel and the court, respectively, as follows:

"Q That you are saying that you are using that pad as the barrel of the gun?

"A Yes * * *

"Q And that the track of these pellets you are saying was slightly upward into the body?

"A Because that is the main entrance, that is the main injury but again that this is just an estimate.

"Q Okay, well this is your opinion?

"A My opinion, yes.

"Q Your medical opinion?

"A Yes * * *

"THE COURT: Could it have happened if a man was holding a trash can up like this and squatting down and the person who is shooting is bending over trying to get the gun to point this way from behind?

"A Then it is no.

"Q It is not possible?

"A No."

In addition to the testimony of both medical experts, which totally discredited the testimony of the decedent's paramour, evidence was adduced from police officers who arrived at the scene shortly after the incident, to the effect that pizza sauce and a green garbage can were found behind the counter, as the defense had maintained. The final *coup de grace* to the People's case was supplied by the decedent's paramour herself, when she apparently fabricated testimony that the decedent was wearing a blue ski jacket at the time of the shooting. The witness testified that after the shooting, a nurse at the scene gave her the jacket with the approval of a police officer, and she took the jacket home and did not clean it or tamper with it in any way. Apart from the fact that none of the police officers who testified remembered seeing a blue ski jacket, the defendant's medical expert testified, without contradiction, that the blue ski jacket—which was brought to court by decedent's paramour and admitted into evidence—could not have been worn by the decedent on the night in question and taken off his person after the shooting, since there was "not even a blood stain" on it.

In view of the aforenoted evidence, Criminal Term was correct in dismissing the indictment on the ground that the People had failed to disprove the justification defense beyond a reasonable doubt. In light of our determination, we need not address the double jeopardy argument raised by the defendant regarding the instant appeal by the People *(cf. People v Gallo,* 75 AD2d 148). Accordingly, the order appealed from must be affirmed.

NIEHOFF, RUBIN and KUNZEMAN, JJ., concur.

Order of the Supreme Court, Queens County, dated September 24, 1981, affirmed.